# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 13-**_____ |
| **v.** | : | **DATE FILED:** __January 29, 2013__ |
| **MICHAEL J. SULLIVAN** | : | **VIOLATIONS:** |
| **MICHAEL LOWRY** | | **18 U.S.C. § 1349 (conspiracy to commit wire** |
| **ROBERT MULGREW** | : | **and mail fraud - 1 count)** |
| **WILLIE SINGLETARY** | | |
| **THOMASINE TYNES** | : | **18 U.S.C. § 1343 (wire fraud - 49 counts)** |
| **MARK A. BRUNO** | | |
| **WILLIAM HIRD** | : | **18 U.S.C. § 1341 (mail fraud - 18 counts)** |
| **HENRY P. ALFANO** | | |
| **a/k/a "Ed" or "Eddie"** | : | **18 U.S.C. § 1623 (perjury - 4 counts)** |
| **ROBERT MOY** | | |
| | : | **18 U.S.C. § 1001 (false statements to FBI - 5** |
| | | **counts)** |
| | : | |
| | | **18 U.S.C. § 2 (aiding and abetting)** |
| | : | |

## I N D I C T M E N T

## COUNT ONE

## CONSPIRACY TO COMMIT WIRE AND MAIL FRAUD

**THE GRAND JURY CHARGES THAT:**

At all times relevant to this Indictment:

1.     The conspirators used the Philadelphia Traffic Court ("Traffic Court") to give preferential treatment to certain ticketholders, most commonly by "fixing" tickets for those with whom they were politically and socially connected.  By doing so, the conspirators defrauded the Commonwealth of Pennsylvania and the City of Philadelphia of funds to which the Commonwealth and the City were entitled.

I.    Background

2.    The Traffic Court was part of the First Judicial District of Pennsylvania. Traffic Court was composed of judges elected by the populace of the City of Philadelphia, as well as Senior Judges, Senior Magisterial District Judges, and Magisterial District Judges assigned to it by the Administrative Office of Pennsylvania Courts of the Supreme Court of Pennsylvania.

3.    Upon commission as a judge of Traffic Court, each judge took a constitutional oath of office and swore or affirmed to discharge the duties of his or her office with fidelity.  Traffic Court judges were required to attend yearly judicial ethics training in Harrisburg, Pennsylvania provided by the Supreme Court of Pennsylvania, Administrative Office of Pennsylvania Courts, Minor Judiciary Education Board.  This training included instructions (i) not to engage in *ex parte* communications with persons interested in a pending case; (ii) not to allow another judge to contact the judge assigned to a pending case to influence its disposition; (iii) to disqualify himself or herself if the judge's impartiality might reasonably be questioned because the judge has personal bias or prejudice concerning a party or personal knowledge of disputed facts, or knows the parties; (iv) to refrain from manifesting bias or prejudice in the performance of official duties; (v) to not lend the prestige of the court to advance the private interests of others or convey or permit others to convey the impression that such other persons are in a special position to influence the judge; (vi) to uphold the integrity and independence of the judiciary; (vii) to avoid impropriety and the appearance of impropriety; (viii) to perform the duties of office impartially; (ix) prohibiting voluntary appearances as a character witness; (x) to be free of personal bias when making decisions and to decide cases based on the proper

application of law; and (xi) to not allow family, social, or other relationships to influence the judge's judicial conduct or judgment.

4.     The full-time, elected Traffic Court judges earned approximately $85,000 each in annual salary.

5.     The Traffic Court judges presided over and adjudicated moving violations, commonly referred to as traffic tickets or citations, occurring within Philadelphia, issued by the Philadelphia Police Department and the Pennsylvania State Police, and other police entities. Traffic Court was responsible for the collection of fines and court costs resulting from guilty pleas and findings of guilt for violations of the Pennsylvania Motor Vehicle Code.

6.     On a daily basis, ticketholders appeared before Traffic Court judges for their trials.  It was not uncommon for a Traffic Court judge to preside over dozens of trials in one session.  The trials involved an appearance by the ticketholder contesting his or her guilt and either an officer from the Philadelphia Police Department, a State Trooper, or another law enforcement officer, who prosecuted the ticket.  The trials were conducted in a courtroom open to the public.   At the hearing, a ticketholder could present documents and advocate for leniency or a favorable disposition, all of which took place in open court.

7.     Traffic Court judges had several options when disposing of citations, including finding the ticketholder guilty of a different offense, guilty, not guilty, not guilty in *absentia*, guilty in *absentia*, guilty with reduction in speed, and dismissal.  In addition, the ticketholder could engage in a plea bargain with the police officer or state trooper or other law enforcement officer.

8.     Guilty adjudications subjected a violator to statutorily determined fines and costs of court, as well as possible statutorily mandated "points" on a driving record.  The Pennsylvania Department of Transportation (PennDOT) maintained a point system to help improve driving habits and to ensure safe driving in Pennsylvania.  Upon a guilty adjudication of certain traffic offenses, such as improper passing, failing to yield or stop, exceeding maximum speed, and leaving the scene of an accident, PennDOT assigned "points" to the ticketholder's driving record.  PennDOT also imposed sanctions, such as a license suspension, when a ticketholder accumulated a certain number of points on his or her driving record.

9.     The moneys received from the fine portion of a guilty adjudication were equally divided between the City of Philadelphia and the Commonwealth of Pennsylvania.  The moneys received from the costs portion of a guilty adjudication were distributed to the following funds of the City of Philadelphia: (1) City Cost (for the City of Philadelphia's general fund); (2) City Cost 2 and 3 (for the City of Philadelphia's general fund); and (3) Live Stop (for the Philadelphia Parking Authority as well as the First Judicial District's procurement department).  Additionally, the moneys were distributed to the following funds of the Commonwealth of Pennsylvania: (1) E.M.S. (Emergency Medical Services fund, which provided training and ensured adequate emergency medical services throughout Pennsylvania, as well as provided money to the catastrophic head injury fund ); (2) MCARE (Medical Care Availability and Reduction of Error fund, which helped compensate people injured by medical negligence); (3) J.C.P. (Judicial Computer Project, which funded the enhancement of computer technology in Pennsylvania courts); and (4) A.T.J. (Access to Justice fund, which provided money for legal aid for low income people and victims of domestic violence in Pennsylvania).  For guilty

4

adjudications of citations issued by the Pennsylvania State Police, the moneys received were distributed exclusively to the Commonwealth of Pennsylvania.

10.     Upon an adjudication of not guilty or dismissal, the ticketholder did not pay any fines or costs.

11.     Every adjudication was entered into a database maintained by the Traffic Court computer system. Thereafter, the ticketholder's file was electronically sent to XEROX (formerly ACS), an information technology contractor, located in Tarrytown, New York. Within several days of every adjudication of a ticket, XEROX (formerly ACS) forwarded the disposition file electronically to PennDOT in Harrisburg.

II.     Overview of Traffic Court Citation Process from Issuance through Adjudication

12.     When issued by an officer, all traffic citations listed a date and time for a summary trial, which was approximately eight weeks from the date of the issuance of the ticket. The ticket further informed the ticketholder that he or she may plead guilty or not guilty within ten days of receipt of the citation. A guilty plea meant that the summary trial date was cancelled, and the ticketholder would pay the applicable fines and costs, as well as be assessed any applicable points against his or her driver's record. If the ticketholder did not notify Traffic Court of his or her desire to plead guilty or to proceed to trial within ten days, Traffic Court mailed a Notice of Impending Suspension of Driving Privileges to the ticketholder.

13.     If the ticketholder pled not guilty within ten days of receiving the citation, Traffic Court mailed the ticketholder a Notice of Trial, which included the scheduled trial date, time, and assigned courtroom, and informed the ticketholder that any request for continuances must be made in writing accompanied by supporting documentation.

14. Citations were randomly assigned by the Traffic Court computer system to be tried in various courtrooms. Traffic Court judges regularly rotated courtrooms. Each week, the administrative judge assigned the judges to specific courtrooms for, and limited to, the coming week. Traffic Court employees were able to access the Traffic Court computer system to determine which judges were presiding over specific cases for that particular week.

III.    The Conspirators

15. Defendant MICHAEL J. SULLIVAN was elected a judge of Traffic Court in or about November 2005, and took the bench on or about January 5, 2006. On or about April 27, 2011, defendant SULLIVAN was appointed the administrative judge for Traffic Court by the Pennsylvania Supreme Court. SULLIVAN hired D.C. as his personal assistant, commonly referred to as a "personal," at Traffic Court. SULLIVAN was also the owner of The Fireside Tavern, a bar located at 2701 South Marshall Street, Philadelphia, Pennsylvania.

16. Defendant MICHAEL LOWRY was elected a judge of Traffic Court in or about November 2007, and took the bench on or about January 3, 2008. Defendant LOWRY hired K.O. as his personal assistant at Traffic Court.

17. Defendant ROBERT MULGREW was elected a judge of Traffic Court in or about November 2007, and took the bench on or about January 3, 2008. Defendant MULGREW hired G.M. as his personal assistant at Traffic Court.

18. Defendant WILLIE SINGLETARY was elected a judge of Traffic Court in or about November 2007, and took the bench on or about January 3, 2008. SINGLETARY hired T.H. as his personal assistant at Traffic Court. In or about December 2008, the Commonwealth of Pennsylvania Court of Judicial Discipline held that defendant WILLIE SINGLETARY's

6

conduct during his campaign for Traffic Court judge brought the judicial office into disrepute in violation of the Article V, § 18(d)(1) of the Pennsylvania Constitution and that he violated Rules Governing Standards of Conduct of Magisterial District Justices. Specifically, the Court of Judicial Discipline found that defendant SINGLETARY, during a meeting with a motorcycle club called the Philadelphia First State Road Rattlers, solicited campaign donations and encouraged people to support him at the polls. The Court of Judicial Discipline further found that SINGLETARY's words and actions conveyed an impression that he would be partial to his supporters. Specifically, SINGLETARY said at the meeting:

> You're all going to help me out? . . . There's going to be a basket going around because I'm running for Traffic Court Judge, right, and I need some money. I got some stuff that I got to do, but if you all can give me twenty ($20) dollars you're going to need me in Traffic Court, am I right about that? . . . Now you all want me to get there, you're all going to need my hook-up, right?

The Court of Judicial Discipline concluded that SINGLETARY "was promising that anyone who gave him money would get favorable consideration from him if he was elected judge. This conduct is the pure antithesis of the concept of 'judge.'" As a result of these violations, the Court of Judicial Discipline ultimately imposed upon SINGLETARY a sanction of "public reprimand" followed by probation for a period of two years. The rulings of the Court of Judicial Discipline were available to the public and were widely reported by the media.

19. Defendant THOMASINE TYNES was a Traffic Court judge from 1989 until her retirement in 2012. She was the President Judge of Traffic Court, which was considered a ceremonial position, with no administrative powers, from 2005 to 2012.

20. Fortunato N. Perri, Sr., charged elsewhere, was appointed to fill a judicial vacancy on Traffic Court in 1997. From 2000 until 2002, Perri served as the administrative

judge. Perri hired defendant WILLIAM HIRD in 1997 as his personal assistant at Traffic Court. Perri became a Senior Judge in 2007. As a Senior Judge, Perri was eligible to accept assignments on Traffic Court when requested. In 2001, as administrative judge, Perri approved defendant HENRY P. ALFANO's business, Century Motors, Inc., for a no-bid towing and storage contract regarding vehicles designated by Philadelphia law enforcement agencies. Through this contract, Century Motors, Inc. derived significant income from vehicle owners for the towing and storage of their vehicles.

21.     H. Warren Hogeland, charged elsewhere, was a Senior Magisterial District Judge assigned to Traffic Court. Hogeland took the bench on or about January 2, 2006, after serving as a Magisterial District Judge in Bucks County, Pennsylvania. As Senior Magisterial District Judge, Hogeland was eligible to accept, and accepted, assignments at Traffic Court. Hogeland, as a Senior Magisterial District Judge, did not have a personal assistant. Hogeland worked regularly with Court Officer M.T.

22.     Defendant MARK A. BRUNO was a Magisterial District Judge from Chester County, Pennsylvania, who occasionally presided over Traffic Court cases.

23.     Kenneth Miller, charged elsewhere, was a Delaware County District Judge from January 1970 until January 2006. He was granted Senior Judge status and worked in Traffic Court for approximately one year, leaving in 2008.

24.     Defendant WILLIAM HIRD was the Director of Records for Traffic Court. Defendant HIRD served as Judge Fortunato N. Perri, Sr.'s personal assistant at Traffic Court from approximately 1997 to 2001. In 2001, Perri recommended that HIRD be promoted to the position of Court Administrator and given the title of Director of Records, which resulted in a

salary increase of more than $20,000 for HIRD. At the time of HIRD's resignation from Traffic Court in or about November 2011, he was earning an annual salary of approximately $80,000. Prior to his employment at Traffic Court, HIRD operated a floor covering business. HIRD also owned the Cannonball Tavern, a bar located at 2268 Kennedy Street, Philadelphia, Pennsylvania.

25.     Defendant HENRY P. ALFANO, a/k/a "Ed," or "Eddie," owned an automobile salvage company called Century Motors, Inc., located at 3101 S. 61st Street, Philadelphia, Pennsylvania. In 2001, Century Motors, Inc. obtained a no-bid towing and storage contract from Traffic Court, while Fortunato N. Perri, Sr. was administrative judge, regarding vehicles designated by Philadelphia law enforcement agencies to be towed and stored, at each owner's expense. Defendant ALFANO was the landlord for two gentlemen's clubs in Philadelphia:   The Oasis Gentlemen's Club ("Oasis"), located at 6800 Essington Avenue, Philadelphia, Pennsylvania; and Christine's Cabaret ("Christine's"), located at 6130 Passyunk Avenue, Philadelphia, Pennsylvania. ALFANO had a business relationship with R.A., who owned and operated two towing companies. ALFANO also had a business relationship with another towing company called Gianna Salvage, Inc., located at 6800 Essington Avenue, Philadelphia, Pennsylvania, located near the Oasis.

26.     Defendant ROBERT MOY operated "Number One Translations," located at 926 Winter Street, Suite 2, Philadelphia, Pennsylvania.

**The Conspiracy**

27.     From in or about July 2008 to in or about September 2011, in

Philadelphia, in the Eastern District of Pennsylvania and elsewhere, defendants

**MICHAEL J. SULLIVAN**
**MICHAEL LOWRY**
**ROBERT MULGREW**
**WILLIE SINGLETARY**
**THOMASINE TYNES**
**MARK A. BRUNO**
**WILLIAM HIRD**
**HENRY P. ALFANO**
**ROBERT MOY**

and H. Warren Hogeland, Kenneth Miller, and Fortunato N. Perri, Sr., all charged elsewhere,

conspired and agreed, together and with others known and unknown to the grand jury, to commit

offenses against the United States, that is,

(a)     to devise and intend to devise a scheme and artifice to defraud, and to

obtain money and property by means of false and fraudulent pretenses, representations, and

promises, and, for the purpose of executing the scheme and artifice and attempting to do so, place

in a post office or authorized depository for mail matter, matter to be sent or delivered by the

Postal Service, and take and receive mail matter, and knowingly cause to be delivered by mail

according to the direction thereon, such mail matter, in violation of Title 18, United States Code,

Section 1341 (Mail Fraud), and

(b)     to devise and intend to devise a scheme and artifice to defraud, and to

obtain money and property by means of false and fraudulent pretenses, representations, and

promises, and, for the purpose of executing the scheme and artifice, transmit or cause to be

transmitted by means of wire communication in interstate commerce, writings, signs, signals, and sounds, in violation of Title 18, United States Code, Section 1343 (Wire Fraud).

**Manner and Means**

It was part of the conspiracy that:

28.     Local politicians, including ward leaders, politically connected individuals, and others who, because of their influential positions in business, labor, or industry, or because of their social connections, asked Traffic Court judges or administrators for preferential treatment on citations issued to constituents, relatives, friends, and associates.

29.     Defendants MICHAEL J. SULLIVAN, MICHAEL LOWRY, ROBERT MULGREW, WILLIE SINGLETARY, THOMASINE TYNES, and MARK A. BRUNO, as well as H. Warren Hogeland, Kenneth Miller and Fortunato N. Perri, Sr., contrary to rules of judicial ethics, for which they received annual training, as well as defendant WILLIAM HIRD, furthered and accepted those requests for preferential treatment because of political support (past, present, and future), business, social, or other relationship with the ticketholder, or opportunity to obtain some form of personal benefit.

30.     In order to provide the requested preferential treatment, defendants MICHAEL J. SULLIVAN, MICHAEL LOWRY, ROBERT MULGREW, WILLIE SINGLETARY, THOMASINE TYNES, MARK A. BRUNO and WILLIAM HIRD, as well as H. Warren Hogeland, Kenneth Miller, and Fortunato N. Perri, Sr., used their positions at Traffic Court to manipulate Traffic Court cases outside the judicial process, thereby achieving favorable outcomes on traffic citations for politically connected individuals, friends, family members, associates, and others with influential positions.  This manipulation, or "ticket fixing," consisted

of: (1) dismissing tickets outright; (2) finding the ticketholder not guilty after a "show" hearing; (3) adjudicating the ticket in a manner to reduce fines and avoid the assignment of points to a driver's record; and (4) obtaining continuances of trial dates to "judge-shop," that is find a Traffic Court judge who would accede to a request for preferential treatment.

31.     Defendants created and participated in an extra-judicial system, not sanctioned by the Pennsylvania court system, where they felt free to approach one another and exchange requests for preferential treatment or "ticket-fixing," without being rebuked or criticized by fellow judges.  Upon one rare exception to this common practice, defendant WILLIE SINGLETARY chided another judge for ignoring his request and failing to give "consideration" on a citation as SINGLETARY requested on behalf of SINGLETARY's family member who was driving without a license.

32.     Traffic Court judges and the administrative staff who participated in the extrajudicial "ticket-fixing" commonly referred to requests for preferential treatment as requests for "consideration."  Traffic Court judges used their personal assistants and courtroom staff to communicate these "consideration" requests to other judges, as well as to receive "consideration" requests from other judges, court administrators, and staff.  Personals and other Traffic Court employees, familiar with the "consideration" process, also made preferential treatment requests on behalf of their friends or family.  In working outside the judicial process, "consideration" enabled judges to "fix" tickets for, and to provide benefits to, well-connected individuals that were not available to the rest of the citizenry.

33.     For years, even beyond the dates of the conspiracy charged, there existed a culture of "ticket-fixing" at Traffic Court.  Both judges and high-level administrators at Traffic

Court perpetuated and furthered this culture of "ticket-fixing" through receiving, arranging, and honoring requests for "ticket-fixing." The "ticket-fixing" was pervasive and frequent.

34. When Traffic Court judges engaged in "ticket-fixing," they nevertheless reported the final adjudication to the various authorities, including PennDOT, as if there had been a fair and open review of the circumstances.

35. Traffic Court judges and staff kept this practice covert. Traffic Court judges and employees undertook steps to conceal the system of "consideration," by shredding paperwork, speaking to one another in code, and trusting only certain individuals and not others to carry out the scheme. This system was not discussed openly, and a well-understood conspiracy of silence fell over the system and its participants.

36. Because judges were assigned to preside over certain cases in a specific courtroom only several days before a hearing, if a judge was seeking preferential treatment for a specific citation, and that case was assigned to another judge, the judge communicated a "consideration" request through his or her personal or staff to the personal or staff of the judge hearing that citation.

37. Personals and courtroom staff regularly accessed the Traffic Court computer system to determine which judge was assigned to a particular trial in order to communicate the "consideration" request to that judge's personal or staff.

38. In acceding to requests for "consideration," defendants were depriving the City of Philadelphia and the Commonwealth of Pennsylvania of money which would have been properly due as fines and costs, as well as depriving the Commonwealth of property in the form

of the Commonwealth's ability to regulate safe drivers on its roadways through licensing suspensions and revocations.

39. Defendant HENRY P. ALFANO, a businessman in towing, scrap metal, and other businesses, used his clout with the Traffic Court to "fix" traffic citations issued to defendant ALFANO's friends, employees, and associates. To do so, ALFANO used his connection with Judge Fortunato N. Perri, Sr. ALFANO provided Perri with traffic citation numbers, the names of the offender on the citations, or the actual citations themselves. Perri was very responsive to ALFANO's requests for preferential treatment on Traffic Court matters. In one telephone conversation, after ALFANO mailed a citation to Perri, Perri said, "I see Century on it, it's gold."

40. Fortunato N. Perri, Sr., in turn, conveyed the information he received from defendant HENRY P. ALFANO regarding traffic citations issued to defendant ALFANO's friends, employees, and associates, to defendant WILLIAM HIRD to arrange preferential treatment, or "consideration," on the designated citations.

41. Defendant WILLIAM HIRD conveyed these "consideration" requests, through personals and court staff, to the judge assigned to each case. At times, Fortunato N. Perri, Sr., through defendant HIRD, attempted to arrange for a specific judge to hear the case.

42. Typically, after a citation was adjudicated, defendant WILLIAM HIRD provided a computer printout from the Traffic Court computer system of the case disposition to Fortunato N. Perri, Sr., which Perri referred to as a "receipt." Perri, in turn, mailed these "receipts" to defendant HENRY P. ALFANO or directly to the ticketholder as confirmation that

the citation had been dismissed or otherwise disposed of.  These "receipts" were not provided in the regular course of business by Traffic Court to ticketholders.

43.     In return for Fortunato N. Perri, Sr.'s assistance with Traffic Court matters, defendant HENRY P. ALFANO provided Perri, free of charge, with a stream of benefits, including free car repairs, car maintenance, and car towing, as well as free videos and free seafood.

44.     Defendant HENRY P. ALFANO regularly arranged for the repair work on Fortunato N. Perri, Sr.'s vehicles to be done by mechanics at his company, Century Motors, Inc., and mechanics at another towing company, which was owned by R.A., all without charge. ALFANO arranged for tow trucks from Towing Unlimited and Gianna Salvage, Inc. to transport Perri's vehicles between Perri's residence and Century Motors, Inc.  Repair work included rebuilding an engine and installing a new transmission, as well as cosmetic and detail work.

45.     In addition to the car repairs, defendant HENRY P. ALFANO arranged to deliver videos to Fortunato N. Perri, Sr.  On approximately one dozen occasions, defendant ALFANO either mailed or hand delivered these videos to Perri free of charge.  ALFANO obtained the videos through his associate, J.C., who owned a video store in Philadelphia, Pennsylvania.  ALFANO owned the property which housed the store.  J.C. had borrowed money from ALFANO to renovate the store, presently owed money to ALFANO, and paid monthly rent to ALFANO.

46.     In December 2009 and during 2010, defendant HENRY P. ALFANO provided seafood, free of charge, to Fortunato N. Perri, Sr.

47.     Fortunato N. Perri, Sr. assisted defendant HENRY P. ALFANO with Traffic Court cases in exchange for these gratuities.  A telephone conversation, on or about December 21, 2010, illustrated this exchange.  At that time, Perri updated defendant ALFANO about a Traffic Court notice that was to be mailed.  Perri and ALFANO showed their mutual appreciation of each other by referring to each other as "the best."  Perri said, "when you call, I move, brother, believe me.   I move everybody."  In appreciation, ALFANO offered to mail videos to Perri.

48.     Fortunato N. Perri, Sr. also assisted other individuals with their Traffic Court matters.  For example, defendant MARK A. BRUNO asked Perri for special assistance on a ticket issued to J.M.

49.     Fortunato N. Perri, Sr. also assisted M.D., a local businessman, with Traffic Court matters.    Perri received landscaping services from M.D's landscaping business, often free of charge or at reduced rates.  Since 2001, Perri also assisted M.D.'s brother, A.D., who owned and operated a material and delivery company and a construction company, with dozens of Traffic Court citations.  A.D. installed a patio for Perri at no charge.

50.     Defendant WILLIAM HIRD furthered Fortunato N. Perri, Sr.'s requests for preferential treatment in part because defendant HIRD was originally hired by Perri to work at Traffic Court, and because Perri was instrumental in assisting HIRD to obtain various promotions, with salary increases, within Traffic Court.  As a result, HIRD was extremely loyal to Perri.  In one phone call on or about March 21, 2011, HIRD expressed gratitude to Perri:  "I'm so thankful for what you did to me.  For me, it's unbelievable. . . .  I got a pension because of you."  In another call on or about January 19, 2011, HIRD told Perri that without Perri he would

still be installing carpet and "moving furniture . . . around." Perri responded "don't forget, whenever I call you, it's really important." During the period of the conspiracy, and even after Perri was retired from active service on Traffic Court, HIRD regularly addressed Perri as "Chief," as a form of endearment and respect.

51. Defendant WILLIAM HIRD, as a high-level administrator at Traffic Court, used his unique position in Traffic Court to facilitate the numerous requests for "consideration" presented to him by Fortunato N. Perri, Sr., local politicians, and others. Defendant HIRD's close relationship with many of the Traffic Court judges enabled him to speak directly to a judge or through the judge's personal assistant and courtroom staff about specific "consideration" requests. HIRD also directed his underlings to convey these "consideration" requests to the judges.

52. Defendant WILLIAM HIRD also facilitated requests for preferential treatment from local politicians, including two Philadelphia ward leaders. Defendant HIRD also received requests for "consideration" from a retired Traffic Court judge, Kenneth Miller.

53. Defendant MICHAEL J. SULLIVAN used his position to "fix" traffic citations on behalf of family, friends, Fireside Tavern customers, a former politician, and a Philadelphia ward leader.

54. In facilitating this preferential treatment, defendant MICHAEL J. SULLIVAN directed individuals to leave their traffic citations or related documents at the Fireside Tavern for him, where employees of the Fireside Tavern placed the Traffic Court documents in a box behind the bar. In or about February 2010, there was one handwritten note in the box that stated:

17

R.H.
267-372-65[xx]
Ticket
Friend of [ward leader]

The citation for R.H. involved a prohibited turn.

55.     Defendant MICHAEL J. SULLIVAN both received requests for "consideration" from other judges' personals and made requests for "consideration" to other judges, as communicated through the personals and court staff.

56.     Defendant WILLIE SINGLETARY participated in the extrajudicial "ticket-fixing" by handling requests for "consideration" from other judges and making such requests to other judges.

57.     Defendant WILLIE SINGLETARY furthered requests for preferential treatment on behalf of friends, associates, and local politicians, including a staff person for a City Councilperson, and a staff person on the Philadelphia Democratic City Committee.  Defendant SINGLETARY either adjudicated these citations himself or he requested other judges to "fix" them.

58.     Defendant WILLIE SINGLETARY also "fixed" traffic citations on behalf of defendant ROBERT MOY, a local businessman who provided Traffic Court services to his customers.  Defendant MOY, who, at times, guaranteed his paying customers favorable results on their Traffic Court citations, used his close relationship with defendant SINGLETARY to arrange his customers' tickets to be assigned to SINGLETARY and for SINGLETARY to "fix" those tickets.

59.     Defendant MICHAEL LOWRY regularly "fixed" and facilitated the "fixing" of traffic tickets for family and local politicians, including two Philadelphia ward leaders.

60.     Defendant MICHAEL LOWRY directed his staff to approach other judges, through their respective personals, to "fix" citations.

61.     Defendant MICHAEL LOWRY "fixed" traffic citations for other judges when they approached his personal and asked for "consideration."

62.     Defendant ROBERT MULGREW regularly "fixed" and facilitated the "fixing" of traffic tickets for local politicians, including a Philadelphia ward leader.

63.     Defendant ROBERT MULGREW directed his staff to approach other judges, through their respective personals, to "fix" citations.

64.     Defendant ROBERT MULGREW "fixed" traffic citations for other judges when they approached his personal and asked for "consideration."

65.     Defendant THOMASINE TYNES, who also had a close relationship with defendant ROBERT MOY, facilitated defendant MOY's requests for "consideration."  Prior to trials, defendant MOY corresponded with TYNES about which of MOY's customers were scheduled to appear before TYNES, and TYNES provided "consideration" to these individuals.

66.     Defendant THOMASINE TYNES both received requests for "consideration" from other judges' personals and made requests for "consideration" to other judges, as communicated through the personals and court staff.

67.     Defendant ROBERT MOY regularly received preferential treatment on behalf of his paying customers from both defendant THOMASINE TYNES, whom defendant

MOY referred to as "Mom," and defendant WILLIE SINGLETARY.  Given his close connection

to defendants TYNES and SINGLETARY, MOY, at times, was able to promise his customers

that they would not receive any "points" on their driving records as a result of the adjudication of

citations.  In fact, MOY advertised in a local newspaper called China News Weekend as follows,

in part:

> Number One Translation/Professional license.
> Telephone: 215-592-7930.
> Fax:  215-853-8698.
> 926 Winter Street, 2/FL, Suite 2, Philadelphia, PA 19107
> Provides all kinds of translations services.  Tackles the traffic ticket,  and passes the
> exams for driver's license.  Citizenship application, and fills out all kinds of forms:
> * Tackles the traffic ticket, and guarantees no points or fewer points.  Help you quickly
> regain your vehicle that is towed away or impounded in Philadelphia.

MOY manipulated the scheduling of his customers' trials through Requests for Continuance and

thus steered his customers' trials toward TYNES and SINGLETARY to secure favorable

outcomes.  MOY regularly informed TYNES and SINGLETARY which of his customers were to

appear before them.  This advance notice further enabled the "fixing" of tickets for MOY's

customers.

### Overt Acts

1.      In or about September 2009, defendant HENRY P. ALFANO arranged  for

repair work and maintenance to be conducted, free of charge, on Perri's Cadillac and Taurus, as

well as Perri's family member's Ford Expedition and Chrysler 300.  Also at this time, defendant

ALFANO arranged for Perri's vehicles to be towed from Perri's residence to the mechanics and

back again.

2.     On or about September 29, 2009, defendant HENRY P. ALFANO informed a ticketholder, B.D., that "they" had to "re-enlist that case" "because they did not like who it was in front of," referring to the practice of defendant WILLIAM HIRD and Fortunato N. Perri, Sr. to arrange for certain cases to be assigned to specific judges to maximize the likelihood of a favorable outcome.  The case was ultimately heard by defendant ROBERT MULGREW, who found ticketholder B.D. not guilty.

3.     In or about January 2010, defendant HENRY P. ALFANO arranged for repair work and maintenance to be conducted, free of charge, on Perri's Cadillac and Taurus, as well as Perri's family member's Ford Expedition and Chrysler 300.  Also at this time, defendant ALFANO arranged for Perri's vehicles to be towed from Perri's residence to the mechanics and back again.

4.     On or about January 22, 2010, defendant HENRY P. ALFANO had a telephone conversation with Fortunato N. Perri, Sr. in which Perri expressed concern that all the repairs being done by defendant ALFANO for Perri was "becoming like a one way street on my end, . . . I like a two way street."  Defendant ALFANO responded that "if I [ALFANO] need something you're [Perri] going to do it."

5.     On or about February 2, 2010, defendant HENRY P. ALFANO spoke with Fortunato N. Perri, Sr. about repairs on Perri's Cadillac and Perri requested that defendant ALFANO send some pictures in an envelope in the car when the car is sent back to Perri.

6.     On or about February 5, 2010, defendant HENRY P. ALFANO told Fortunato N. Perri, Sr. that he forgot "to put the package of films in the trunk" but that he would "get 'em to you."

7.      On or about February 19, 2010, Fortunato N. Perri, Sr. acknowledged to defendant HENRY P. ALFANO that defendant ALFANO had saved Perri's daughter $10,000 in repairs.

8.      On or about February 23, 2010, defendant HENRY P. ALFANO had a conversation with J.C. in which J.C. advised defendant ALFANO that he had received a parking ticket. ALFANO stated that Perri "can't fix them" because parking tickets go to the Parking Authority and not Traffic Court. Nonetheless, ALFANO told J.C. to give him the ticket and ALFANO would "see what [he] can do . . . I'll try . . . I don't know if it is possible, but I'll give it a good try."

9.      The next day, defendant HENRY P. ALFANO asked Fortunato N. Perri, Sr. for help with J.C.'s parking ticket and Perri told defendant ALFANO to mail him the ticket. Perri also instructed ALFANO to "pack [the videos] real nice . . . tape 'em and all."

10.      On or about May 7, 2010, Fortunato N. Perri, Sr. and defendant WILLIAM HIRD had a telephone conversation discussing citations which defendant HENRY P. ALFANO wanted "fixed." Perri said, "I got a matter for the 12th. It's one of Eddie's [defendant ALFANO]. . . . There is another one here he just mailed . . . . It is a two ticket thing." Perri said he would give the tickets to defendant HIRD the next day. HIRD also explained that he had another one of "Eddie's" [ALFANO's] "on the 10th." HIRD explained that he did not "know who [which Traffic Court judge] is in there, but we'll see . . . but we'll figure it out . . . . I'll work it out."

11.      On or about May 18, 2010, Perri had a telephone conversation with defendant HENRY P. ALFANO, explaining to him that he asked for a continuance on certain

tickets because "the district justices were sitting" because "all the judges were away last week" and "maybe I [Perri] could not get it through you know what I mean?" Defendant ALFANO responded, "I gotcha. I got the picture."

12. In or about July 2010, defendant HENRY P. ALFANO arranged for repair work and maintenance to be conducted, free of charge, on Perri's Cadillac and Taurus, as well as Perri's family member's Ford Expedition and Chrysler 300. Also at this time, defendant ALFANO arranged for Perri's vehicles to be towed from Perri's residence to the mechanics and back again.

13. In or about October 2010, defendant HENRY P. ALFANO arranged for repair work and maintenance to be conducted, free of charge, on Perri's Cadillac and Taurus, as well as Perri's family member's Ford Expedition and Chrysler 300. Also at this time, defendant ALFANO arranged for Perri's vehicles to be towed from Perri's residence to the mechanics and back again.

14. On or about December 9, 2010, defendant HENRY P. ALFANO and Fortunato N. Perri, Sr. discussed Perri's seafood request, including dozens of shrimp and crabcakes. Perri suggested that he would pay because "this is a lot of money," but defendant ALFANO refused.

15. On or about December 21, 2010, ALFANO told Perri that his business associate would deliver the seafood to Perri the next day.

16. On or about December 9, 2010, Fortunato N. Perri, Sr. and M.D. had a telephone conversation in which Perri offered to help M.D. with construction equipment that had been impounded by Philadelphia police on Route 1.

17.     On or about December 10, 2010, defendant WILLIAM HIRD spoke with a Philadelphia ward leader, about the impoundment of the ward leader's son's truck. The ward leader said he already called defendant MICHAEL LOWRY about this.

18.     In a telephone conversation on or about January 14, 2011, defendant MARK A. BRUNO and Fortunato N. Perri, Sr. discussed "fixing" a citation received by J.M. Perri offered to "look into it," stating that he still "got a little connections." During the call, Perri took credit for "putting" defendant BRUNO in Traffic Court to preside over cases.

19.     In calls after on or about January 14, 2011, Fortunato N. Perri, Sr. discussed defendant MARK A. BRUNO's request to "fix" J.M.'s ticket with defendant WILLIAM HIRD. Both defendant HIRD and Perri discussed measures to remove any points assessed on the ticket.

20.     On or about March 15, 2011, defendant WILLIAM HIRD had a telephone conversation with another Philadelphia ward leader about "fixing" a specific ticket. The ward leader told defendant WILLIAM HIRD that he wanted to slide an item under defendant HIRD's door, referring to a traffic citation. HIRD instructed the ward leader to put "H" on it so that HIRD knew it was from the ward leader. The next day, HIRD and the ward leader further discussed the citation. The ward leader said that the ticketholder wanted to avoid points. HIRD said that the ticket would likely be reduced to 10 mph or 5 mph over the speed limit and that with 10 mph there would still be points assigned. HIRD said, "I'll ask for 5 over but I don't know that'll happen because it's 90 . . . they don't normally go down to 5 . . . and its State Police . . . they got the equipment . . . they got radar, they got tracker." In another call that day, the ward

leader asked whether the ticketholder even had to show up for the trial, and HIRD agreed that the ticketholder should plead not guilty.

21.     On or about May 12, 2011, defendant MICHAEL J. SULLIVAN had a telephone conversation with an individual known as "Pop" about "fixing" Pop's son's citation for going through a red light.  "Pop" told defendant SULLIVAN that he "need [ed] [SULLIVAN] to take care of [it] for me."  SULLIVAN said he'd "look into it."  In a subsequent call, SULLIVAN told "Pop" to leave the ticket at the bar and SULLIVAN said he would  "tell you what you got to do . . . and I'll handle it."

**Acts Related to Citation No. S02459903, Issued on 10/31/09**
**(Ticket # 1 - R.C.C.)**

22.     On or about January 4, 2010, Fortunato N. Perri, Sr. and defendant HENRY P. ALFANO discussed R.C.C.'s citation, which R.C.C. received on October 31, 2009, from a Philadelphia police officer for having an expired inspection sticker and which carried a fine of $25 and costs of $126.50.  In this call, Perri requested that defendant ALFANO give Perri the number for R.C.C.'s citation.   Defendant ALFANO said he would ask R.C.C.'s father for that information.

23.     On or about January 5, 2010, H. Warren Hogeland adjudicated R.C.C.'s ticket as not guilty.

24.     On or about January 15, 2010, defendant HENRY P. ALFANO updated Fortunato N. Perri, Sr. about the repairs on Perri's car.  During the course of the conversation, Perri stated that he mailed a "receipt" to R.C.C.'s father.  Perri inquired whether R.C.C.'s father received the "receipt."

25.    On or about February 17, 2010, A.S. visited defendant HENRY P.

ALFANO at Century Motors, Inc. to discuss a citation that A.S. received two days earlier from a

Pennsylvania State Trooper for driving a tractor trailer that was dropping ice and snow onto

travel lanes, striking vehicles on Interstate 95, and which carried a fine of $300 and costs of

$142.

26.    On or about March 8, 2010, A.S. contacted defendant HENRY P.

ALFANO about his matter in Traffic Court.  Referring to a March 3, 2010, notification from

Traffic Court that his driving privileges were being suspended because he failed to respond to the

traffic citation, A.S. said he will "drop [the Traffic Court information] off" to defendant

ALFANO.  ALFANO stated, "we'll take care of it . . . we're working on it."

27.    On or about March 15, 2010, in an interstate telephone call between

Fortunato N. Perri, Sr., in Pennsylvania, and defendant HENRY P. ALFANO, in New Jersey,

defendant ALFANO told Perri that he was working on deodorizing Perri's car.  ALFANO

confirmed that Perri received A.S.'s "thing" that ALFANO sent Perri in the mail.  Perri stated

that "it will be alright, don't worry about it."

28.    On or about March 26, 2010, A.S. told defendant HENRY P. ALFANO

that he received a Notice of License Suspension because he did not plead guilty or not guilty.

Defendant ALFANO told him that "he [Perri] already did that for you."  ALFANO told A.S.  to

bring him the Notice and ALFANO will send it to Fortunato N. Perri, Sr. again.  ALFANO said

that he already spoke to Perri about A.S.'s citation and that Perri said everything was okay and

that Perri would send a receipt when the case was over.  ALFANO assured A.S. that his license would not be suspended.  ALFANO speculated that the notice is just computer generated because A.S.'s case was already "set up for April the 20th."

29.    On or about March 26, 2010, defendant HENRY P. ALFANO told Fortunato N. Perri, Sr. that A.S. received another Notice of License Suspension and was concerned because he was a truck driver and cannot have a suspended license.  Perri told defendant ALFANO that Perri was "on top of that . . . I don't want you worry about that."  Perri instructed ALFANO to mail the notice to Perri.   ALFANO told Perri that he was working on Perri's Ford Taurus to correct the oil leak and clean the car.

30.    In a subsequent call on this same date, defendant HENRY P. ALFANO assured A.S. that Fortunato N. Perri, Sr. had "it under control."  Defendant ALFANO further told A.S. that he did not have to appear at the Traffic Court hearing because Perri is "gonna handle it. . . it's just gonna be knocked out."

31.    On or about March 27, 2010, Fortunato N. Perri, Sr.  and defendant WILLIAM HIRD discussed A.S.'s citation.  Perri said that "the guy keeps getting letters" from Traffic Court that his license may be suspended.  Defendant HIRD said he would look into it and "stop all that action," and that the ticketholder should "ignore it."

32.    On or about April 20, 2010, defendant MICHAEL J. SULLIVAN adjudicated A.S.'s citation as not guilty, even though A.S. never appeared in court.

33.    On or about May 12, 2010, defendant HENRY P. ALFANO told A.S. that he should have his "receipt in a couple of days."

34.     On or about May 12, 2010, Fortunato N. Perri, Sr. and defendants WILLIAM HIRD and MICHAEL J. SULLIVAN caused a "receipt" to be mailed to A.S., which documented that his citation was adjudicated not guilty.

**Acts Related to Citation Nos. VOO311146, V00311150, V00311161, and V00311172, Issued on 03/06/10**
**(Tickets #3 through #6 – L.R. and the Oasis)**

35.     On or about March 6, 2010, defendant HENRY P. ALFANO called Fortunato N. Perri, Sr. to discuss an Oasis bus, driven by L.R., that was impounded by the police on that date.  (A Philadelphia police officer issued two citations to L.R. for not having a CDL (commercial driver's license), which carried a fine of $500 and costs of $101.50, and for not having a medical certificate, which carried a fine of $25 and costs of $101.50.  At the same time, the Oasis, the company that owned the bus, also received two citations from a Philadelphia police officer for not having a fire extinguisher and a warning device, where each citation carried a fine of $51 and costs of $101.50.)  Perri advised defendant ALFANO that he would "make it easy" to get the bus released.

36.     On or about March 7, 2010, defendant HENRY P. ALFANO provided Fortunato N. Perri, Sr. with information related to the citations.  Specifically, defendant ALFANO told Perri that the bus was registered to the Oasis Gentlemen's Club, 6800 block of Essington Avenue, and the date it was impounded.  ALFANO explained that the side of the bus advertised an establishment called Christine's.

37.     On or about March 8, 2010, in an interstate telephone call between Fortunato N. Perri, Sr., in Pennsylvania, and defendant HENRY P. ALFANO, in New Jersey, Perri told defendant ALFANO that there were four tickets and "you'll take care of that with me."

Perri instructed ALFANO that the owner and the driver should go to the Boot and Tow window at Traffic Court, ask for D.H., and state that "they're there to pick up the bus [and] to get the bus released." Perri further instructed ALFANO that defendant MICHAEL J. SULLIVAN would "waive the collateral on the four tickets [and] they don't have to post that money." Lastly, Perri said, "and then you'll give me those four matters," referring to the citations.

38.     On or about March 9, 2010, defendant HENRY P. ALFANO advised A.A., a business associate with supervisory authority over the bus impounded by the police, that he did not have to pay the four tickets and attend Traffic Court. Defendant ALFANO said, "no, when you get [the notices in the mail] you give them to me."

39.     On or about May 10, 2010, defendant MICHAEL J. SULLIVAN continued the hearing for the two Oasis tickets.

40.     On or about May 12, 2010, defendant MARK BRUNO adjudicated L.R.'s citations as not guilty.

41.     On or about May 18, 2010, Fortunato N. Perri, Sr. and defendant HENRY P. ALFANO discussed the continuance on the Oasis tickets. Perri explained that the district justices were sitting the previous week and all the judges were away and therefore maybe Perri "couldn't get it through, you know what I mean?" Defendant ALFANO responded, "I gotcha. I got the picture " Perri instructed ALFANO to mail Perri any notices.

42.     In a subsequent call on or about May 18, 2010, Fortunato N. Perri, Sr. confirmed with defendant WILLIAM HIRD that the Oasis matter was continued. Defendant HIRD explained that defendant MICHAEL J. SULLIVAN continued the matter because defendant SULLIVAN did not realize it was for "him," referring to Perri. Defendant HIRD

explained that he gave it to D.C., SULLIVAN's personal assistant, but that she "[------] up" and that HIRD should go directly to SULLIVAN instead. Perri said that he only gave SULLIVAN "five a year," in reference to requests for consideration.

43.     On or about May 21, 2010, Fortunato N. Perri, Sr. told defendant HENRY P. ALFANO that he was mailing defendant ALFANO two receipts, and "you got a couple more coming."

44.     On or about June 9, 2010, defendant MICHAEL J. SULLIVAN again continued the hearing for the two Oasis tickets. On or about June 11, 2010, Traffic Court mailed a Notice of Trial for the Oasis tickets with a trial date of September 8, 2010.

45.     On or about June 29, 2010, Fortunato N. Perri, Sr. told HENRY P. ALFANO that defendant ALFANO will receive another continuance notice on one of the pending citations. Perri further told ALFANO that "somebody" will "need" "to show up" at the hearing. Perri continued that "when [the ticketholder] get[s] a notice, you'll call me with the notice and mail it . . . . and don't worry . . . it'll be taken care of . . . ." Later in the call, ALFANO offered to inspect Perri's car whenever Perri was ready.

46.     In a later call on that same date, defendant HENRY P. ALFANO told A.A. that one of the Oasis tickets will be continued and that A.A. would receive a notice and should tell ALFANO accordingly.

47.     On or about September 8, 2010, defendant ROBERT MULGREW adjudicated the Oasis citation V00311161 guilty and the Oasis citation V00311172 not guilty.

48.    On or about April 14, 2010, defendant HENRY P. ALFANO and C.W., a tow truck driver for Gianna Salvage, Inc., discussed a citation issued to Gianna Salvage, Inc. on this date.  (C.W. received a citation for driving a towing vehicle without a current towing license, which carried a fine of $540 and costs of $61.50.)

49.    On or about April 14, 2010, defendant HENRY P. ALFANO and C.W. discussed this citation and ALFANO told C.W. that the tow truck would not be impounded. ALFANO told C.W. to give ALFANO the citation.

50.    On or about April 19, 2010, Fortunato N. Perri, Sr. caused the portion of C.W.'s citation, which indicated a plea of not guilty, to be mailed to Traffic Court.

51.    On or about April 20, 2010, defendant HENRY P. ALFANO updated Fortunato N. Perri, Sr.  regarding the progress of repairs for Perri's Taurus.  When Perri told defendant ALFANO to tell him "the damage," meaning the cost for the car repairs, ALFANO responded by asking whether Perri received in the mail the Gianna citation.  Perri said he received it.

52.    On or about June 9, 2010, defendant MICHAEL J. SULLIVAN continued the hearing for this citation.

53.    On or about September 8, 2010, defendant ROBERT MULGREW adjudicated this citation as not guilty.

**Acts Related to Citation No. P1K8JW566M1, issued on 08/26/10**
**(Ticket No. 8 – D.S.)**

54.     On or about November 23, 2010, defendant HENRY P. ALFANO spoke

with the father of D.S. about D.S.'s traffic citation.  (On or about August 26, 2010, D.S. received

a citation for traveling at a speed of 85 mph in a 55 mph zone on Interstate 95, which carried a

fine of $85 and costs of $162, and subjected D.S. to a possible penalty under the Pennsylvania

Vehicle Code of five points to her driving record.)

55.     In a subsequent call on that date, defendant HENRY P. ALFANO told

Fortunato N. Perri, Sr. that "the last one [ALFANO] sent [Perri,]" the ticketholder is "gonna go."

Defendant ALFANO remarked that he prefers to make the ticketholders attend their hearings, as

it "makes it better."  Perri said "it'll be alright though."

56.     On or about November 24, 2010, defendant HENRY P. ALFANO asked

Fortunato N. Perri, Sr. whether "that girl's ok" and Perri responded that she was "fine."

Defendant ALFANO again informed Perri that "they're gonna be there."  ALFANO and Perri

confirmed that the hearing was on the "30th" at 9 a.m.  Perri responded, "You are in good hands

with Allstate."

57.     On or about November 24, 2010, Fortunato N. Perri, Sr.  informed

defendant WILLIAM HIRD, in reference to D.S.'s citation, that "[Perri's] got a girl coming

down" on November 30th and defendant HIRD stated that Perri should call HIRD to give him

the information.

58.     On or about November 29, 2010, Fortunato N. Perri, Sr. told defendant

WILLIAM HIRD the citation number on D.S.'s ticket and that "she'll be in."  HIRD

acknowledged that this was a State Police ticket and promised to "look at it" and "we'll go from there."

59.     On or about November 30, 2010, in an interstate telephone call between Fortunato N. Perri, Sr., in Pennsylvania, and defendant HENRY P. ALFANO, in New Jersey, defendant ALFANO asked about the ticket. Perri said that it was a state police ticket and that he was "on top of it" and told ALFANO that "when you give me something it's important brother."

60.     On or about November 30, 2010, Fortunato N. Perri, Sr. asked defendant WILLIAM HIRD "how [did] we do?" Defendant HIRD stated that he did not definitely know the result because the courtroom was busy, but he was "going to assume ok" because the assigned judge was defendant MICHAEL LOWRY.

61.     On or about November 30, 2010, defendant MICHAEL LOWRY adjudicated the citation as guilty of a different offense, which was a lower offense and which reduced the fine and costs.

62.     On or about November 30, 2010, defendant WILLIAM HIRD informed Fortunato N. Perri, Sr. that the charge was amended to five miles over the speed limit, despite the objection of the state police trooper, who wanted the offender to receive two points on her license.

63.     Later, on or about November 30, 2010, Fortunato N. Perri, Sr. informed defendant HENRY P. ALFANO of the result that the ticket was amended and "there's no points" and opined that "she still got a good break."

**Acts Related to Citation No. S01839412, Issued on 07/27/09**
**(Ticket #9 – B.D.)**

64.　　On or about July 27, 2009, defendant HENRY P. ALFANO learned about a citation issued to B.D., a tow truck driver for Gianna Salvage, Inc., for towing a vehicle without the proper rotation lights activated, which carried a fine of $25 and costs of $126.50.

65.　　On or about September 28, 2009, a Traffic Court judge continued the hearing.

66.　　On or about September 29, 2009, in discussing the citation, defendant HENRY P. ALFANO told B.D. that "you're gonna get another [] thing from the [Traffic] Court because they had to re-enlist that case today. . . . They had to re-enlist it because they didn't like who it was in front of. So they're gonna to re-enlist it. When you get the new one, bring it to me."

67.　　On or about December 9, 2009, defendant ROBERT MULGREW adjudicated the citation as not guilty.

**Acts Related to Citation No. X03704481, Issued on 03/25/11**
**(Ticket #10 – Ri.H.)**

68.　　On or about May 9, 2011, Ri.H. spoke with defendant MICHAEL J. SULLIVAN about a citation Ri.H. received for leaving the scene of an accident where there was property damage to another vehicle, subjecting him to a possible penalty under the Pennsylvania Vehicle Code of four points to his driving record, a fine of $300, and costs of $143.50. (Traffic Court issued notices dated April 14, 2011, and May 5, 2011, advising Ri.H. that his driving privileges were being suspended and the fine/costs were increased to $415 for his failure to respond to the citation.) Ri.H. informed defendant SULLIVAN that he had received another

"notice of suspension" from Traffic Court. SULLIVAN stated "disregard it . . . don't worry about it . . . I got it."

69.     On or about May 26, 2011, Ri.H. reminded defendant MICHAEL J. SULLIVAN about his hearing the next day and defendant SULLIVAN responded, "I got it." SULLIVAN said that he was "off" tomorrow, but he "got it" and it "don't matter" which judge will be hearing Ri.H.'s case. Ri.H. told SULLIVAN that he "ain't got no money, you know what I mean?" SULLIVAN said, "I know you're broke" and assured him that "you're good."

70.     On or about May 27, 2011, defendant MICHAEL LOWRY dismissed the citation.

## Acts Related to Citation Nos. X04074103 and X04074114, Issued on 05/12/11
### (Tickets #11 and #12 – M.A.)

71.     On or about May 12, 2011, W.A., the owner of a construction company, called defendant MICHAEL J. SULLIVAN about one of the company's drivers getting his truck stuck under a bridge. (The driver, M.A., was driving a truck and trailer carrying an excavator owned by a construction company when it struck the overhead of a bridge. The vehicle was impounded and a Philadelphia police officer issued two citations to M.A. for exceeding height of vehicle, which carried a fine of $300 and costs of $102.50, and for violation of vehicle equipment, which carried a fine of $100 and costs of $102.50.) W.A. told defendant SULLIVAN said that the truck was to be impounded. SULLIVAN told W.A. that he needed his registration, insurance, and identification to release the truck from the Boot and Tow at Traffic Court. SULLIVAN also told W.A. to text him when W.A. arrived at Traffic Court. SULLIVAN said he would discuss the citations that M.A. received later. SULLIVAN warned W.A. "don't say

nothing to nobody out there." Later that day, defendant W.A. sent an interstate text message to SULLIVAN.

72.     The next day, on or about May 13, 2011, W.A. called defendant MICHAEL J. SULLIVAN to get together for lunch.

73.     On or about July 5, 2011, eight days before the trial date, in an interstate call between W.A. in Pennsylvania and defendant MICHAEL J. SULLIVAN in New Jersey, W.A. asked defendant SULLIVAN to get together for lunch.

74.     On or about July 13, 2011, defendant MICHAEL J. SULLIVAN adjudicated both of M.A.'s citations as not guilty.

### Acts Related to Citation Nos. X03716801 and X03716812, Issued on 05/18/11 (Tickets #13 and #14 – R.C.)

75.     On or about May 19, 2011, R.C. called defendant MICHAEL J. SULLIVAN about his citations. (The day before, R.C. received two citations for careless driving of his motorcycle, which carried a fine of $25 and costs of $102.50, and for being an unlicensed driver, which carried a fine of $200 and cots of $102.50, after he drove his motorcycle through a stop sign without stopping and did not have a proper license.) Defendant SULLIVAN advised R.C. about getting his motorcycle released from Traffic Court. SULLIVAN further instructed R.C. to come to Traffic Court on the court date listed on the citations. SULLIVAN said he would talk to R.C. later about the citations. SULLIVAN said "get your bike out now" and "we'll deal with the rest of the stuff later."

76.     On or about June 20, 2011, H. Warren Hogeland adjudicated both of R.C.'s citations as not guilty.

**Acts Related to Citation Nos. X05080176, X05080180, and X05080191, Issued on 04/17/11**
**(Tickets #15 through #17 – K.S.)**

77.     On or about June 20, 2011, M.S., the brother of K.S., texted defendant

MICHAEL J. SULLIVAN about K.S.'s traffic citations.  (K.S.. received three citations, on or

about April 17, 2011, for driving his car while disregarding two consecutive red signals, driving

his car with a fraudulent inspection certificate, and driving his car with a fraudulent emissions

certificate.  According to the Pennsylvania Vehicle Code, K.S. faced a penalty that included an

assignment of three points to K.S.'s driving record if found guilty of the offense of failure to stop

for a red signal.  Each of K.S.'s citations carried a fine of $25 and costs of $127.50.)  The text

between M.S. and defendant SULLIVAN was as follows:

> M.S.:       Judge about [K.S.] has an appearance tomorrow he good or its all
>             good??
>
> SULLIVAN:  It's all good he have to show up
>
> M.S.:       Ok 1pm he'll be there
>
> M.S.:       He put in the in box at office forgot what day 21st or 23rd the
>             schmuck let me know please what day show
>
> SULLIVAN:  Tomorrow D court 1PM
>
> M.S.:       I said it one I said it twice you da man !!!!
>
> SULLIVAN:  Hahaha txs

78.     On or about June 21, 2011, a Traffic Court judge adjudicated K.S.'s

citation as not guilty for disregarding red signals, but found him guilty of the fraudulent

inspection and emissions certificates.

79.     On or about June 21, 2011, Ji.T. discussed with defendant MICHAEL J.

SULLIVAN the upcoming trial date for G.C.'s citation.  (G.C., an associate of Ji.T., received a

citation from a Pennsylvania State Trooper for operating his vehicle with an expired inspection,

which carried a fine of $25 and costs of $127.50.  G.C. initially mailed a check to Traffic Court

in the amount of $152.50 in response to a Notice from Traffic Court that his driving privileges

would be suspended because he failed to respond to the citation.  Thereafter, G.C. mailed a

written request to Traffic Court to continue his June 23, 2011, trial date).  In the phone call, Ji.T.

provided defendant SULLIVAN with the spelling of G.C.'s last name.  Ji.T. also expressed an

interest in writing a newspaper article about SULLIVAN's new role as Administrative Judge at

Traffic Court.

80.     On or about June 23, 2011, G.C. failed to appear in Traffic Court because

he had received a notice from Traffic Court advising him that his hearing had been continued

until July 26, 2011.

81.     On or about June 23, 2011, H. Warren Hogeland adjudicated G.C.'s

citation as not guilty despite the fact that G.C. was not in court because a new trial date had been

scheduled.

82.     On or about July 15, 2011, Ji.T., not knowing that the ticket had already

been adjudicated, called defendant MICHAEL J. SULLIVAN again about G.C.'s citation.  J.T.

mentioned a letter from Traffic Court that stated that G.C.'s hearing date was on July 26, in "a

week from now."  Defendant SULLIVAN said that he was aware of the citation and trial date,

and said, "I got that." Ji.T. said that he would "call [SULLIVAN] on it." J.T. again expressed an interest in doing a "story" and taking a "photo" of SULLIVAN.

83.     On or about July 23, 2011, G.C. received a check in the mail for $152.50 from Traffic Court, refunding the collateral previously posted for G.C.'s citation, which was adjudicated not guilty.

## Acts Related to Citation No. V02490762, Issued on 10/14/10
### (Ticket #19 – K.M.)

84.     Between on or about October 14, 2010 and on or about December 14, 2010, Kenneth Miller, charged elsewhere, mailed information pertaining to K.M.'s citation to defendant WILLIAM HIRD.  (K.M. was issued a citation for passing traffic at approximately 60 mph in a 45 mph zone, which carried a fine of $25 and costs of $126.50.)

85.     On or about December 14, 2010, Kenneth Miller contacted defendant WILLIAM HIRD about this citation and said "that thing for [K.M.] is tomorrow," to which defendant HIRD responded "I know."  Speaking in code to one another to signal that K.M. did not need to attend the trial, HIRD stated that "I don't think anybody is going to that party."  To clarify, Miller stated, "I'll tell him [K.M.] that the meeting is cancelled."

86.     On or about December 15, 2010, H. Warren Hogeland adjudicated K.M.'s citation as not guilty, despite the fact that K.M. did not appear in court.

## Acts Related to Citation No. V02803861, Issued on 12/11/10
### (Ticket #20 – J.B.)

87.     Between on or about December 11, 2010, and on or about February 2, 2011, Kenneth Miller mailed information pertaining to J.B.'s citation to defendant WILLIAM

HIRD.  (J.B. received a traffic citation for making an improper left turn, which caused an accident, and which carried a fine of $25 and costs of $126.50.)

88.     On or about February 2, 2011, Kenneth Miller left a voice mail message for defendant WILLIAM HIRD regarding J.B.'s citation.  In this message,  Miller said that J.B. received a notice and asked defendant HIRD to check on his citation.  Miller referenced "the meeting," again speaking in code for the upcoming trial date on February 14, 2011, that Miller and HIRD had discussed previously.

89.     On or about February 14, 2011, defendant WILLIE SINGLETARY adjudicated J.B.'s citation as not guilty.

### Acts Related to Citation Nos. V02509043 and V02509054, Issued on 12/03/10 (Tickets #21 and #22 – J.J.)

90.     Between on or about December 3, 2010, and on or about February 3, 2011, J.R., owner of a towing company, spoke with defendant WILLIAM HIRD about citations issued to J.J., a truck driver for the towing company.  (The citations were for towing a vehicle without rear lighting and without a towing agreement, which carried a fine of $125 and costs of $142.50 for the first offense and a fine of $500 and costs of $142.50 for the second offense.)

91.     On or about February 3, 2011, defendant WILLIAM HIRD told J.R. to give certain paperwork to his driver.

92.     On or about February 8, 2011, J.R. complained to defendant WILLIAM HIRD about taking care of his trucks, such as tow licenses and inspections, yet he still had problems with "you guys," meaning Traffic Court.  Defendant HIRD said that it was "no big

deal," but J.R. said that he did not "want to use all my favors with you." HIRD said he would see J.R.'s "guy" tomorrow at Traffic Court and that he should plead not guilty.

93.     On or about February 9, 2011, J.R. called defendant WILLIAM HIRD to tell defendant HIRD that he was in Courtroom D and HIRD said, "I know where you're at. . . . You're in D."

94.     On or about February 9, 2011, defendant MICHAEL J. SULLIVAN adjudicated J.J.'s citations as not guilty.

### Acts Related to Citation No. V02677065, Issued on 01/28/11
### (Ticket #23 – M.D.)

95.     On or about January 28, 2011, M.D. called Fortunato N. Perri, Sr. about a citation he received for making a prohibited u-turn, which carried a fine of $25 and costs of $102.50.

96.     On or about February 9, 2011, Fortunato N. Perri, Sr. caused a portion of M.D.'s traffic citation, which stated a plea of not guilty and included M.D.'s forged signature, to be mailed to Traffic Court.

97.     On or about March 14, 2011, defendant WILLIAM HIRD told Fortunato N. Perri, Sr. that he "got the date on [M.D.] everything's okay. . . . that didn't go yet, so we got that." Perri also mentioned another Traffic Court matter for "the eyeglass guy" to which defendant HIRD responded, "that's coming up. I got things under control." Perri offered to HIRD, "if you need eyeglasses, let me know."

98.     On or about April 1, 2011, defendant THOMASINE TYNES adjudicated M.D.'s citation as not guilty.

**Acts Related to Citation Nos. V01711511 and V01711522, Issued on 10/02/10
(Tickets #24 and #25 – A.K.)**

99.     On or about November 1, 2010, A.D. told Fortunato N. Perri, Sr. that he had a "guy" who had "a couple tickets," and Perri told A.D. to "stop" over.  (A.D. was referencing two citations received by his employee, A.K., on or about October 2, 2010, for driving at an unsafe speed and for failing to wear a seatbelt, which carried a fine of $25 and costs of $126.50, and a fine of $10 and costs of $92, respectively.  According to the Pennsylvania Vehicle Code, A.K. faced a penalty that included an assignment of two points to A.K.'s driving record if found guilty of the offense of driving too fast.)

100.     On or about December 16, 2010, defendant THOMASINE TYNES adjudicated both of these citations as not guilty.

**Acts Related to Citation Nos. V01988851, V01988862, V01988873, and V01988884, Issued on 10/13/10
(Tickets #26 through #29 – C.I.)**

101.     Between on or about October 13, 2010, and on or about November 29, 2010, V.B., an employee at an industrial company referred to here as C.I., informed defendant WILLIAM HIRD about four citations the company and one of its truck drivers, M.R., received. (These citations were for hauling an impermissible width of load, which carried a fine of $300 and costs of $101.50, for not having a permit to carry a load with a blade of such length, which carried a fine of $500 and costs of $101.50, for an unregistered vehicle, which carried a fine of $75 and costs of $101.50, and for lack of permit, which carried a fine of $500 and costs of $101.50.)

102.	On or about November 29, 2010, V.B. reminded defendant WILLIAM HIRD that "we'll be in there Wednesday morning at 9 o'clock" for the four tickets for the C.I. trucks that were impounded and were released "about a month ago."  V.B. reminded defendant HIRD that HIRD had instructed him to call HIRD a "couple days ahead" of the hearing.  HIRD said that he did not know yet to which courtroom the case was assigned and HIRD told V.B. that it should be on the Notice.  HIRD said that he needed to know "where it's at," otherwise "you're going to be flying on a wing and a prayer, you know what I mean?"  V.B. told HIRD the citation number V01988851 in order for HIRD to "track it down."

103.	On or about November 30, 2010, in an interstate telephone call between V.B., in New Jersey, and defendant WILLIAM HIRD, in Pennsylvania, V.B. asked defendant HIRD "how we make out for tomorrow?"  HIRD, speaking in code, said, "I'm gonna see ya for coffee, ain't I?"  V.B. said, "I just want to make sure," and HIRD responded, "I'm gonna be available for coffee."  V.B. asked, "We're in good shape, then?"  HIRD responded, "Yeah, I'll talk to you tomorrow for coffee."  V.B. suggested that they meet at 8:30 a.m. to which HIRD responded, "closer to 9."

104.	On or about December 1, 2010, V.B. told defendant WILLIAM HIRD that he parked in the back of Traffic Court and asked whether he should come upstairs.  HIRD said he would meet V.B..

105.	On or about December 1, 2010, defendant MICHAEL LOWRY dismissed each of the citations.

106.	On or about December 2, 2010, Fortunato N. Perri, Sr. told defendant WILLIAM HIRD that he knew that V.B. went in the "back gate yesterday."  Perri said, "I

wouldn't even park in the [] back. . . .  You don't want people to see what [] you're doing. . . .
You do things quietly, diplomatically, like we do."

### Acts Related to Citation No. V02705021, Issued on 01/18/11
### (Ticket #30 – H.W.)

107.    On or about May 3, 2011, J.F., a staff person for a City of Philadelphia

Councilperson, contacted defendant WILLIE SINGLETARY's personal assistant, T.H., for the

purpose of getting a citation issued to H.W. dismissed. (By way of background, on or about

January 18, 2011, H.W. had received a citation for improper backing, which carried a fine of $25

and costs of $127.50, and the possible assignment of three points to H.W.'s driving record.

Thereafter, H.W. gave his brother, J.W., the citation to handle.  Meanwhile, on or about April 20,

2011, defendant WILLIE SINGLETARY adjudicated H.W.'s citation guilty *in absentia,* and

imposed penalties and a $167.50 fine, after H.W. failed to appear for the hearing despite

receiving two notices from Traffic Court. On or about May 3, 2011, H.W. received a letter from

PennDOT informing him that the "conviction . . . mandates a 3 point assessment to [his] driving

record.")

108.    Sometime after May 3, 2011, H.W. again told his brother, J.W., about the

letter from PennDOT.   Around that time, J.W. contacted J.F. to assist with the citation.

109.    On or about May 6, 2011, J.W. faxed, or caused to be faxed, to Traffic

Court the letter from PennDOT about the assessment of three points to H.W.'s driving record.

110.    Defendant WILLIE SINGLETARY instructed his personal, T.H., to

complete a Request for Continuance form and backdate it for March 1, 2011, thereby allowing

the conviction of H.W. to be reopened.   The Request for Continuance was signed by defendant SINGLETARY.

111.    Between on or about May 11, 2011, and on or about May 17, 2011, defendant MICHAEL J. SULLIVAN agreed that the case against H.W. should be reopened.

112.    On or about June 8, 2011, defendant WILLIE SINGLETARY adjudicated H.W.'s citation as not guilty.

113.    On or about June 16, 2011, defendant MICHAEL J. SULLIVAN mailed a letter to PennDOT requesting that PennDOT "rescind the points in connection with this citation."

**Acts Related to Citation No. V00194165, Issued on 06/04/10**
**(Ticket #31 – N.M.)**

114.    Sometime shortly after June 4, 2010, N.M. called defendant WILLIE SINGLETARY on the telephone to discuss her citation and their mutual friend, M.L.  (On or about June 4, 2010, N.M. received a citation for failing to stop or slow down at a red signal while driving her car, which carried a fine of $25 and costs of $101.50, and possibly subjected her to the assignment of three points on her driving record under the Pennsylvania Vehicle Code.)

115.    On or about August 6, 2010, defendant MICHAEL J. SULLIVAN adjudicated N.M.'s citation as not guilty.

**Acts Related to Citation No. V00656084 and V00656095, Issued on 06/26/10**
**(Tickets #32 and #33 - N.M. )**

116.    Sometime after June 26, 2010, N.M. called defendant WILLIE SINGLETARY yet again and provided him information about additional citations that she received on or about June 26, 2010, for driving the wrong way down a one-way street, which

carried a fine of $25 and costs of $126.50, and for failure to use a child restraint, which carried a fine of $25 and costs of $126.50.

117.    On or about August 30, 2010, defendant MICHAEL LOWRY dismissed both of N.M.'s citations.

### Acts Related to Citation Nos. V01892936, V01892940, and V01892951, Issued 08/06/10 (Tickets #34 through #36 – A.H.)

118.    Shortly after August 6, 2010, defendant WILLIE SINGLETARY directed his personal assistant, T.H., to designate the citations issued to A.H. for "consideration." (On or about August 6, 2010, A.H. received three citations for operating an ATV on the highway, which carried a fine of $100 and costs of $101.50, for an unregistered vehicle, which carried a fine of $75 and costs of $101.50, and for an unlicensed driver, which carried a fine of $200 and costs of $101.50.)

119.    On or about October 7, 2010, a Request for Continuance, approved by defendant WILLIE SINGLETARY, was received in Traffic Court, purportedly made by A.H.

120.    On or about November 10, 2010, defendant WILLIE SINGLETARY adjudicated all three citations as not guilty.

### Acts Related to Citation Nos. V00997485 and V00997496, Issued on 07/20/10 (Tickets #37 and #38 – Gi.G.)

121.    Sometime after July 30, 2010, Ga.G., the husband of Gi.G., contacted defendant WILLIE SINGLETARY about Gi.G.'s citations for driving at an unsafe speed, which carried a fine of $25 and costs of $101.50, and for an unregistered vehicle, which carried a fine of $75 and costs of $101.50. (According to the Pennsylvania Vehicle Code, Gi.G. faced a penalty

that included an assignment of two points to her driving record if found guilty of the unsafe speed offense.)  Ga.G. gave the citations to defendant SINGLETARY.

      122.    Defendant WILLIE SINGLETARY directed his personal assistant, T.H., to designate this case for "consideration."

      123.    On or about September 21, 2010, defendant WILLIE SINGLETARY told Ga.G. that Gi.G. did not need to appear at Traffic Court for her trial the next day.

      124.    On or about September 22, 2010, defendant WILLIE SINGLETARY adjudicated both citations as not guilty.

### Acts Related to Citation Nos. E05442102 and E05442113, Issued on 05/29/08
### (Tickets #39 and #40 – T.B.)

      125.    Shortly after May 29, 2008, D.C. informed defendant MICHAEL J. SULLIVAN of her "consideration" request for two citations issued to T.B. for careless driving and for being an unlicensed driver.  (These citations carried a fine of $25 and costs of $140, and of $200 and $140, respectively, and possibly subjected T.B. to an assignment of three points on his driving record if found guilty of careless driving).  Defendant SULLIVAN approved of D.C. furthering this "consideration" request to defendant THOMASINE TYNES, which D.C. did.

      126.    On or about July 31, 2008, defendant THOMASINE TYNES adjudicated both citations as not guilty.

### Acts Related to Citation Nos. E07371910, Issued on 10/12/08
### (Ticket #41 – Ja.T.)

      127.    Sometime after October 12, 2008, M.T., a court officer at Traffic Court, asked for "consideration" for Ja.T.'s citation.  (On or about October 12, 2008, Ja.T. received a citation from a Pennsylvania State Trooper for tailgating, which carried a fine of $25 and costs of

$100.  According to the Pennsylvania Vehicle Code, Ja.T. faced a penalty that included an assignment of three points to her driving record if found guilty of the offense.)

128.    On or about December 16, 2008, defendant ROBERT MULGREW adjudicated the citation as not guilty.

### Acts Related to Citation No. S02544835, Issued on 10/18/09
### (Ticket #42 – F.L.)

129.    Shortly after October 18, 2009, defendant MICHAEL LOWRY directed his personal assistant, K.O., to designate the citation received by F.L. for "consideration."  (On or about October 18, 2009, F.L. received a citation for careless driving, which carried a fine of $25 and costs of $101.50.   According to the Pennsylvania Vehicle Code, F.L. faced a penalty that included an assignment of three points to her driving record if found guilty of the offense.)

130.    Sometime after October 18, 2009, K.O. checked the Traffic Court computer system to determine which judge was assigned to F.L.'s trial.  K.O. then conveyed defendant MICHAEL LOWRY's "consideration" request for F.L.'s citation to the personal assistant for defendant MICHAEL J. SULLIVAN.

131.    On or about December 22, 2009, defendant MICHAEL J. SULLIVAN adjudicated the citation as not guilty.

### Acts Related to Citation No. V01868613, Issued on 06/10/10
### (Ticket #43 – A.T.)

132.    Soon after on or about June 10, 2010, A.T. brought his citation to defendant ROBERT MOY's company, Number One Translations, and paid Number One Translations approximately $200 in cash to handle his ticket.  (A.T. received a citation for driving his car onto a sidewalk, which carried a fine of $25 and costs of $101.50.)

133.    After June 10, 2010, Number One Translations informed A.T. that he did not have to appear at Traffic Court.

134.    On or about June 18, 2010, defendant ROBERT MOY, through Number One Translations, mailed the portion of A.T.'s citation, which stated a plea of not guilty, to Traffic Court.

135.    On or about August 6, 2010, defendant ROBERT MOY sent defendant THOMASINE TYNES a note that informed her of the trial date, courtroom, and presiding judge for A.T.'s citation.

136.    On or about August 12, 2010, defendant MICHAEL J. SULLIVAN adjudicated this citation as not guilty.

## Acts Related to Citation No. X03644955, Issued on 03/07/11
### (Ticket #44 – G.L.)

137.    Soon after March 7, 2011, G.L.'s parents brought G.L.'s citation to defendant ROBERT MOY's company, Number One Translations, and paid Number One Translations between $100 and $200 in cash.  (On or about March 7, 2011, G.L. received a citation from a Philadelphia police officer for drifting lanes while looking down at a phone while driving, which carried a fine of $25 and costs of $102.50.   According to the Pennsylvania Vehicle Code, G.L. faced a penalty that included an assignment of three points to his driving record if found guilty of the offense.)

138.     After March 7, 2011, Number One Translations informed G.L. that he did not have to appear at Traffic Court.

139.	On or about March 15, 2011, defendant ROBERT MOY, through Number One Translations, mailed the portion of G.L.'s citation, which stated a plea of not guilty, to Traffic Court.

140.	On or about May 6, 2011, a Request for Continuance was made containing G.L.'s forged signature.  The Request for Continuance fraudulently stated that G.L. had "a doctor appointment."  This Request for Continuance was approved by defendant THOMASINE TYNES.

141.	On or about July 29, 2011, a Request for Continuance was made containing G.L.'s forged signature.  The Request for Continuance fraudulently stated that G.L. needed a continuance because he could not "take off from work."  This Request for Continuance was approved by defendant WILLIE SINGLETARY.

142.	On or about August 19, 2011, a Request for Continuance was made containing G.L.'s forged signature.  The Request for Continuance stated that G.L.'s "translator will be available on September 14 at night court."  This Request for Continuance was approved by defendant WILLIE SINGLETARY.

143.	On or about September 16, 2011, defendant ROBERT MOY sent defendant THOMASINE TYNES a note that informed her of the trial date, courtroom, and presiding judge for G.L.'s citation.

144.	On or about September 21, 2011, defendant THOMASINE TYNES adjudicated this citation as not guilty.

## Acts Related to Citation No. V00604844, Issued on 04/22/10
### (Ticket #45 – O.S.)

145. Soon after April 22, 2010, O.S. brought his citation to defendant ROBERT MOY's company, Number One Translations, and paid Number One Translations approximately $200 to handle this ticket. (On or about April 22, 2010, O.S. received a citation issued by a Philadelphia police officer for speeding at 70 mph in a 30 mph zone, which carried a fine of $25 and costs of $101.50. According to the Pennsylvania Vehicle Code, O.S. faced a penalty of two points to his driving record if found guilty of the offense.)

146. On or about May 3, 2010, defendant ROBERT MOY, through Number One Translations, mailed the portion of O.S.'s citation, which stated a plea of not guilty, to Traffic Court.

147. On or about June 19, 2010, defendant ROBERT MOY sent defendant THOMASINE TYNES a note that informed her of the trial date, courtroom, and presiding judge for O.S.'s citation.

148. On or about June 25, 2010, defendant THOMASINE TYNES adjudicated this citation as not guilty.

## Acts Related to Citation No. X05394782, Issued on 06/27/11
### (Ticket #46 – S.C.)

149. Soon after June 27, 2011, S.C. read defendant ROBERT MOY's advertisement in the newspaper, and brought his citation to defendant MOY's company, Number One Translations. He paid approximately $250 to $300 in cash to have MOY's company handle his citation. (On or about June 27, 2011, S.C. received a citation for a stop sign violation, which carried a fine of $25 and costs of $102.50.)

150.     On or about July 6, 2011, defendant ROBERT MOY, through Number One Translations, mailed the portion of S.C.'s citation, which stated a plea of not guilty, to Traffic Court.

151.     On or about August 24, 2011, a Request for Continuance was made containing S.C.'s forged signature.  The Request for Continuance stated that S.C.'s "translator will be available on 9/14/11 in the afternoon."   The Request for Continuance was approved by defendant THOMASINE TYNES.

152.     On or about September 13, 2011, defendant ROBERT MOY sent defendant WILLIE SINGLETARY a note that informed him of the trial date, time, courtroom, and presiding judge for S.C.'s citation.

153.     On or about September 14, 2011, defendant WILLIE SINGLETARY adjudicated this citation as not guilty.

### Acts Related to Citation No. X04743782, Issued on 03/12/11
#### (Ticket #47 – J.H.)

154.     Soon after March 12, 2011, J.H., after reading defendant ROBERT MOY's advertisement in the newspaper, brought her citation to defendant MOY's company, Number One Translations, and paid Number One Translations approximately $350 in cash to handle her ticket. (On or about March 12, 2011, J.H. received a citation by a Philadelphia police officer for disregarding a stop sign, which carried a fine of $25 and costs of $143.50.  According to the Pennsylvania Vehicle Code, J.H. faced a penalty that included three points to her driving record if found guilty of the offense.)

155.    In response to Notices of Impending Suspension of Driving Privileges on March 30, 2011, and a Notice of License Suspension on April 20, 2011, defendant ROBERT MOY mailed the Notice of Impending Suspension of Driving Privileges back to Traffic Court and stated a plea of not guilty on that document.

156.    On or about May 13, 2011, a Request for Continuance was made containing J.H.'s signature.   The Request for Continuance falsely stated that J.H. "will be in New York City."   The Request for Continuance was approved by defendant THOMASINE TYNES.

157.    On or about August 12, 2011, another Request for Continuance was made containing J.H.'s signature.  The Request for Continuance stated that "[m]y translator won't be available until 9/14/2011 at 3:00 pm."

158.    On or about September 13, 2011, defendant ROBERT MOY sent defendant WILLIE SINGLETARY a note that informed him of the trial date, time, courtroom, and presiding judge for J.H.'s citation.

159.    On or about September 14, 2011, defendant WILLIE SINGLETARY adjudicated this citation as not guilty.

### Acts Related to Citation No. X04104962, Issued on 04/22/11
### (Ticket #48 – W.R.)

160.    Soon after April 22, 2011, W.R. brought his citation to defendant ROBERT MOY and paid defendant MOY to handle the citation.  (On or about April 22, 2011, W.R. received a citation for disregarding a steady red signal, which carried a fine of $50 and

costs of $102.50. According to the Pennsylvania Vehicle Code, W.R. faced a penalty that included three points to his driving record if found guilty of the offense.)

161.    On or about June 17, 2011, a Request for Continuance was made containing W.R.'s forged signature.   The Request for Continuance falsely stated that W.R. "can't take off."   The Request for Continuance was approved by defendant ROBERT MULGREW.

162.    On or about August 12, 2011, another Request for Continuance was made containing W.R.'s forged signature.  The Request for Continuance stated that "[m]y translator won't be available until 9/14/2011 at 3:00 pm."  The Request for Continuance was approved by defendant THOMASINE TYNES.

163.    On or about September 13, 2011, defendant ROBERT MOY sent defendant WILLIE SINGLETARY a note that informed him of the trial date, time, courtroom, and presiding judge for W.R.'s citation.

164.    On or about September 14, 2011, defendant WILLIE SINGLETARY adjudicated this citation as not guilty.

**Acts Related to Citation No. X04885090, Issued on 05/03/11**
**(Ticket #49 – J.Ji.)**

165.    Sometime after May 3, 2011, and after reading defendant ROBERT MOY's advertisement in the newspaper, J.Ji. brought his citation to defendant MOY's company, Number One Translations, and paid it approximately $200 in cash to handle his ticket. (On or about May 3, 2011, J.Ji. received a citation for failing to yield to oncoming traffic, which carried a fine of $25 and costs of $127.50.  According to the Pennsylvania Vehicle Code, J.Ji. faced a

penalty that included an assignment of three points to his driving record if found guilty of the offense.)

166.     On or about May 19, 2011, defendant ROBERT MOY, through Number One Translations, mailed the portion of J.Ji.'s citation, which stated a plea of not guilty, to Traffic Court.

167.     On or about July 1, 2011, a Request for Continuance was made containing J.Ji.'s forged signature.  The Request for Continuance falsely stated that J.Ji. "will be out of state."   The Request for Continuance was approved by defendant THOMASINE TYNES.

168.     On or about August 24, 2011, a Request for Continuance was made containing J.Ji.'s forged signature.   The Request for Continuance falsely stated that J.Ji. "was out of state on 7/6/11."   The Request for Continuance was approved by defendant THOMASINE TYNES.

169.     On or about September 27, 2011, defendant ROBERT MOY sent defendant WILLIE SINGLETARY a note that informed him of the trial date, time, courtroom, and presiding judge for J.Ji.'s citation.

170.     On or about September 27, 2011, defendant WILLIE SINGLETARY adjudicated this citation as not guilty.

### Acts Related to Citation No. X04310180, Issued on 07/24/11
**(Ticket #50 – J.Ji.)**

171.     Soon after July 24, 2011, J.Ji., brought another citation to defendant ROBERT MOY's company, Number One Translations, and paid it approximately $200 in cash to handle his latest ticket. (On or about July 24, 2011, J.Ji. received a citation from a Philadelphia

police officer for making an improper right turn, which carried a fine of $25 and costs of $102.50.)

172.    On or about August 4, 2011, defendant ROBERT MOY mailed the portion of J.Ji.'s citation, which stated a plea of not guilty, to Traffic Court.

173.    On or about September 27, 2011, defendant ROBERT MOY sent defendant WILLIE SINGLETARY a note that informed him of the trial date, time, courtroom, and presiding judge for J.Ji.'s citation.

174.    On or about September 27, 2011, defendant WILLIE SINGLETARY adjudicated this citation as not guilty.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS TWO TO FIFTY

## WIRE FRAUD

**THE GRAND JURY FURTHER CHARGERS THAT:**

1.        Paragraphs 1 through 26 of Count One and the "Overt Acts" of Count One are realleged here.

## THE SCHEME

2.        Paragraphs 28 through 67 of Count One are realleged here.

3.        On or about the following dates, in the Eastern District of Pennsylvania and elsewhere, the defendants listed below, having devised a scheme to defraud the City of Philadelphia and Commonwealth of Pennsylvania, and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, for the purpose of executing the scheme to defraud, knowingly caused to be transmitted, and aided and abetted the transmission of, by means of wire communication in interstate commerce, the signals and sounds described below, each transmission constituting a separate count:

| COUNT | DEFENDANTS | TICKET # and CITATION NO. | DATE | WIRE TRANSMISSION |
|-------|-----------|--------------------------|------|-------------------|
| 2 | ALFANO | Ticket #1 (R.C.C.) S02459903 | Between on or about 10/31/09 and on or about 1/5/10 | Interstate computer check of citation |
| 3 | ALFANO HIRD SULLIVAN | Ticket #2 (A.S.) P1J0PK568L4 | 3/15/10 | Interstate telephone call |

| 4 | ALFANO HIRD BRUNO MULGREW | Tickets #3 - #6 (L.R. / Oasis) V00311146 V00311150 V00311161 V00311172 | 3/8/10 | Interstate telephone call |
|---|---|---|---|---|
| 5 | ALFANO HIRD LOWRY | Ticket #8 (D.S.) P1K8JW566M1 | 11/30/10 | Interstate telephone call |
| 6 | ALFANO HIRD LOWRY | Ticket #8 (D.S.) P1K8JW566M1 | 11/29/10 | Interstate computer check of citation |
| 7 | ALFANO MULGREW | Ticket #9 (B. D.) S01839412 | 9/28/09 | Interstate computer access to list continuance of case |
| 8 | SULLIVAN LOWRY | Ticket #10 (Ri.H.) X03704481 | 5/30/11 | Interstate computer transmission of adjudication batch |
| 9 | SULLIVAN | Tickets #11 and #12 (M.A.) X04074103 X04074114 | 5/12/11 | Interstate text message |
| 10 | SULLIVAN | Tickets #11 and #12 (M.A.) X04074103 X04074114 | 7/5/11 | Interstate telephone call |
| 11 | SULLIVAN | Tickets #11 and #12 (M.A.) X04074103 X04074114 | 7/18/11 | Interstate computer transmission of adjudication batch |
| 12 | SULLIVAN | Tickets #13 and #14 (R.C.) X03716801 X03716812 | 6/22/11 | Interstate computer transmission of adjudication batch |

| 13 | SULLIVAN | Tickets #13 and #14 (R.C.) X03716801 X03716812 | Between on or about 5/18/11 and on or about 6/20/11 | Interstate computer check of citation |
|----|----------|---------|---------|---------|
| 14 | SULLIVAN | Tickets #15 through #17 (K.S.) X05080176 | 6/20/11 | Interstate text message |
| 15 | SULLIVAN | Ticket #18 (G.C.) P1P0J84T431 | Between on or about 6/20/11 and on or about 7/15/11 | Interstate computer check of citation |
| 16 | HIRD | Ticket #19 (K.M.) V02490762 | 12/20/10 | Interstate computer transmission of adjudication batch |
| 17 | HIRD | Ticket #19 (K.M.) V02490762 | Between on or about 10/14/10 and on or about 12/15/10 | Interstate computer check of citation |
| 18 | SULLIVAN HIRD | Tickets #21 and #22 (J.J.) V02509043 V02509054 | Between on or about 12/3/10 and on or about 2/9/11 | Interstate computer check of citation |
| 19 | SULLIVAN HIRD | Tickets #21 and #22 (J.J.) V02509043 V02509054 | 2/14/11 | Interstate computer transmission of adjudication batch |
| 20 | TYNES HIRD | Ticket #23 (M.D.) V02677065 | Between on or about 1/28/11 and on or about 3/14/11 | Interstate computer check of citation |
| 21 | TYNES | Tickets #24 and #25 (A.K..) V01711511 V01711522 | Between on or about 11/1/10 and on or about 12/16/10 | Interstate computer check of citation |

| 22 | HIRD LOWRY | Tickets #26 - #29 (C.I.) V01988851 V01988862 V01988873 V01988884 | Between on or about 11/29/10 and on or about 12/1/10 | Interstate computer check of citation |
|---|---|---|---|---|
| 23 | HIRD LOWRY | Tickets #26 - #29 (C.I.) V01988851 V01988862 V01988873 V01988884 | 11/30/10 | Interstate telephone call |
| 24 | SINGLETARY | Ticket #30 (H.W.) V02705021 | Between on or about 5/6/11 and on or about 6/8/11 | Interstate computer access to list continuance of case |
| 25 | SINGLETARY SULLIVAN | Ticket #31 (N.M.) V00194165 | Between on or about 6/4/10 and on or about 8/6/10 | Interstate computer check of citation |
| 26 | SINGLETARY SULLIVAN | Ticket #31 (N.M.) V00194165 | 8/9/10 | Interstate computer transmission of adjudication batch |
| 27 | SINGLETARY LOWRY | Tickets #32 and #33 (N.M.) V00656084 V00656095 | Between on or about 6/26/10 and on or about 8/30/10 | Interstate computer check of citation |
| 28 | SINGLETARY LOWRY | Tickets #32 and #33 (N.M.) V00656084 V00656095 | 9/1/10 | Interstate computer transmission of adjudication batch |
| 29 | SINGLETARY | Tickets #34 - #36 (A.H.) V01892936 V01892940 V01892951 | 10/7/10 | Interstate computer access to list continuance of case |

| 30 | SINGLETARY | Tickets #34 - #36 (A.H.) V01892936 V01892940 V01892951 | 11/15/10 | Interstate computer transmission of adjudication batch |
|---|---|---|---|---|
| 31 | SINGLETARY | Tickets #37 and #38 (Gi.G.) V00997485 V00997496 | Between on or about 7/30/10 and on or about 9/22/10 | Interstate computer check of citation |
| 32 | SINGLETARY | Tickets #37 and #38 (Gi.G.) V00997485 V00997496 | 9/27/10 | Interstate computer transmission of adjudication batch |
| 33 | SULLIVAN TYNES | Tickets #39 and #40 (T.B.) E05442102 E05442113 | Between on or about 5/29/08 and on or about 7/31/08 | Interstate computer check of citation |
| 34 | SULLIVAN TYNES | Tickets #39 and #40 (T.B.) E05442102 E05442113 | 8/4/08 | Interstate computer transmission of adjudication batch |
| 35 | MULGREW | Ticket #41 (Ja.T.) E07371910 | Between on or about 10/12/08 and on or about 12/16/08 | Interstate computer check of citation |
| 36 | MULGREW | Ticket #41 (Ja.T.) E07371910 | 12/18/08 | Interstate computer transmission of adjudication batch |
| 37 | LOWRY SULLIVAN | Ticket #42 (F.L.) S00623000 | Between on or about 10/18/09 and on or about 12/22/09 | Interstate computer check of citation |
| 38 | LOWRY SULLIVAN | Ticket #42 (F.L.) S00623000 | 12/24/09 | Interstate computer transmission of adjudication batch |

| 39 | SULLIVAN MOY | Ticket #43 (A.T.) V01868613 | 8/16/10 | Interstate computer transmission of adjudication batch |
|---|---|---|---|---|
| 40 | TYNES MOY | Ticket #44 (G.L.) X03644955 | 5/6/11 | Interstate computer access to list continuance of case |
| 41 | TYNES MOY | Ticket #44 (G.L.) X03644955 | 7/29/11 | Interstate computer access to list continuance of case |
| 42 | TYNES MOY | Ticket #45 (O.S.) V00604844 | 6/28/10 | Interstate computer transmission of adjudication batch |
| 43 | SINGLETARY MOY | Ticket #46 (S.C.) X05395782 | 8/24/11 | Interstate computer access to list continuance of case |
| 44 | SINGLETARY MOY | Ticket #47 (J.H.) X04743782 | 5/13/11 | Interstate computer access to list continuance of case |
| 45 | SINGLETARY MOY | Ticket #47 (J.H.) X04743782 | 8/12/11 | Interstate computer access to list continuance of case |
| 46 | SINGLETARY MOY | Ticket #48 (W.R.) X04104962 | 6/17/11 | Interstate computer access to list continuance of case |
| 47 | SINGLETARY MOY | Ticket #48 (W.R.) X04104962 | 8/12/11 | Interstate computer access to list continuance of case |
| 48 | SINGLETARY MOY | Ticket #49 (J.Ji.) X04885090 | 7/1/11 | Interstate computer access to list continuance of case |
| 49 | SINGLETARY MOY | Ticket #49 (J.Ji.) X04885090 | 8/24/11 | Interstate computer access to list continuance of case |
| 50 | SINGLETARY MOY | Ticket #50 (J.Ji.) X04310180 | 9/29/11 | Interstate computer transmission of adjudication batch |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNTS FIFTY-ONE TO SIXTY-EIGHT

## MAIL FRAUD

**THE GRAND JURY FURTHER CHARGES THAT:**

1.     Paragraphs 1 through 26 of Count One and the "Overt Acts" of Count One are realleged here.

## THE SCHEME

2.     Paragraphs 28 through 67 of Count One are realleged here.

3     On or about the following dates, in the Eastern District of Pennsylvania and elsewhere, the defendants listed below, having devised a scheme to defraud the City of Philadelphia and Commonwealth of Pennsylvania, and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, for the purpose of executing the scheme to defraud, and attempting to do so, knowingly took, received, and aided and abetted the taking and receiving, from an authorized depository for mail matter, and caused to be delivered, and aided and abetted the delivery of, by the United States mail, according to directions thereon, the mail described below, each transmission constituting a separate count:

| COUNT | DEFENDANTS | TICKET # and CITATION NO. | DATE | MAILING |
|-------|-----------|---------------------------|------|---------|
| 51 | ALFANO | Ticket #1 (R.C.C. ) S02459903 | Between on or about 1/5/10 and on or about 1/15/10 | "Receipt" mailed |
| 52 | ALFANO | Ticket #2 (A.S.) P1J0PK568L4 | 3/15/10 | Citation information mailed |

| 53 | ALFANO | Ticket #2 (A.S.) P1J0PK568L4 | 5/12/10 | "Receipt" mailed |
|----|--------|------|---------|---------|
| 54 | ALFANO BRUNO | Ticket #3 and #4 (L.R.) V0031114-6 V0031115-0 | 5/21/10 | "Receipt" mailed |
| 55 | ALFANO MULGREW | Ticket #7 (Gianna Salvage, Inc.) V00322394 | 4/19/10 | Citation information mailed |
| 56 | ALFANO MULGREW | Ticket #7 (Gianna Salvage, Inc.) V00322394 | Between on or about 4/14/10 and on or about 4/19/10 | Citation information mailed |
| 57 | SULLIVAN | Ticket #18 (G.C.) P1P0J84T431 | 7/23/11 | Refund of money mailed |
| 58 | HIRD | Ticket #19 (K.M.) V02490762 | Between on or about 10/14/10 and on or about 12/14/10 | Citation information mailed |
| 59 | SINGLETARY HIRD | Ticket #20 (J.B.) V02803861 | Between on or about 12/11/10 and on or about 2/2/11 | Citation information mailed |
| 60 | TYNES HIRD | Ticket #23 (M.D.) V02677065 | 2/9/11 | Citation information mailed |
| 61 | SINGLETARY SULLIVAN | Ticket #30 (H.W.) V02705021 | Between on or about 5/6/11 and on or about 6/8/11 | Letter mailed to PennDOT requesting that points be rescinded |

| 62 | SULLIVAN MOY | Ticket #43 (A.T.) V01868613 | 6/18/10 | Citation information mailed |
|---|---|---|---|---|
| 63 | TYNES MOY | Ticket #44 (G.L.) X03644955 | 3/15/11 | Citation information mailed |
| 64 | TYNES MOY | Ticket #45 (O.S.) V00604844 | 5/3/10 | Citation information mailed |
| 65 | SINGLETARY MOY | Ticket #46 (S.C.) X05395782 | 7/6/11 | Citation information mailed |
| 66 | SINGLETARY MOY | Ticket #47 (J.H.) X04743782 | 4/20/11 | Citation information mailed |
| 67 | SINGLETARY MOY | Ticket #49 (J.Ji.) X04885090 | 5/19/11 | Citation information mailed |
| 68 | SINGLETARY MOY | Ticket #50 (J.Ji.) X04310180 | 8/4/11 | Citation information mailed |

All in violation of Title 18, United States Code, Sections 1341 and 2.

## COUNT SIXTY-NINE

## PERJURY - MICHAEL LOWRY

**THE GRAND JURY FURTHER CHARGERS THAT:**

1.     Paragraphs 1 through 26 and 28 through 67 of Count One, and the "Overt Acts" of Count One, are incorporated here.

2.     On or about October 25, 2011, in the Eastern District of Pennsylvania, defendant

## MICHAEL LOWRY,

while under oath and testifying in a proceeding before a grand jury of the United States in the Eastern District of Pennsylvania, knowingly made a false material declaration.

3.     The grand jury empaneled on or about February 4, 2011, was conducting an investigation to determine, in part, whether individuals at and associated with Traffic Court engaged in the manipulation of tickets outside the judicial process, commonly known as "ticket-fixing" and referred to as "consideration."  It was material to this investigation to determine which individuals, and specifically which judges, participated in this practice.

4.     With respect to this material matter, referring to requests for consideration, defendant MICHAEL LOWRY testified as follows, at page 49 of the transcript:

Q:     Your testimony is you don't give out special favors; is that right?

A.     No, I treat everybody in that courtroom the same.

5.     The testimony of defendant MICHAEL LOWRY, as he then and there well knew and believed, was false, in that LOWRY did give out special favors, in that he accepted and was influenced by "consideration" requests from other judges and individuals.

67

In violation of Title 18, United States Code, Section 1623.

**COUNT SEVENTY**

**PERJURY - ROBERT MULGREW**

**THE GRAND JURY FURTHER CHARGERS THAT:**

1.      Paragraphs 1 through 26 and 28 through 67 of Count One, and the "Overt Acts" of Count One, are incorporated here.

2.      On or about November 8, 2011, in the Eastern District of Pennsylvania, defendant

**ROBERT MULGREW**,

while under oath and testifying in a proceeding before a grand jury of the United States in the Eastern District of Pennsylvania, knowingly made a false material declaration.

3.      The grand jury empaneled on or about February 4, 2011, was conducting an investigation to determine, in part, whether individuals at and associated with Traffic Court engaged in the manipulation of tickets outside the judicial process, commonly known as "ticket-fixing" and referred to as "consideration."  It was material to this investigation to determine which individuals, and specifically which judges, participated in this practice.

4.      With respect to this material matter, referring to requests for consideration, defendant ROBERT MULGREW testified as follows, at pages 17-18 and 22-23 of the transcript:

Q:      How about your personal, has your personal received any calls like that from other judges, other ward leaders that she's conveyed to you saying that so and so has called about this case?

A:      If she did, she didn't convey them to me.

. . .

69

Q. Let me make sure as well that if I got your testimony correct. You're saying that if other people whether they be political leaders, friends and family, anybody is approaching your personal and asking her specifically to look out for a case, see what she can do in a case, give preferential treatment, however you want to phrase it, that she is not relaying any of that information on to you; is that correct?

A. No, she isn't.

5. The testimony of defendant ROBERT MULGREW, as he then and there well knew and believed, was false, in that MULGREW's personal assistant did communicate to him "consideration" requests from other judges and individuals.

In violation of Title 18, United States Code, Section 1623.

<u>**COUNT SEVENTY-ONE**</u>

**PERJURY - THOMASINE TYNES**

**THE GRAND JURY FURTHER CHARGERS THAT:**

1.     Paragraphs 1 through 26 and 28 through 67 of Count One, and the "Overt Acts" of Count One, are incorporated here.

2.     On or about October 4, 2011, in the Eastern District of Pennsylvania, defendant

**THOMASINE TYNES,**

while under oath and testifying in a proceeding before a grand jury of the United States in the Eastern District of Pennsylvania, knowingly made a false material declaration.

3.     The grand jury empaneled on or about February 4, 2011, was conducting an investigation to determine, in part, whether individuals at and associated with Traffic Court engaged in the manipulation of tickets outside the judicial process, commonly known as "ticket-fixing" and referred to as "consideration."  It was material to this investigation to determine which individuals, and specifically which judges, participated in this practice.

4.     With respect to this material matter, defendant THOMASINE TYNES testified as follows, at page 27 of the transcript:

Q:     In all the years you've been [at Traffic Court] have you ever been asked to give favorable treatment on a case to anybody?

A:     No, not favorable treatment.  People basically know me.  The lawyers know me. The court officers know me.  I have been called a no nonsense person because I'm just not that way.  I take my position seriously and the cards fall where they may.

5.     The testimony of defendant TYNES, as she then and there well knew and believed, was false, in that TYNES was asked to give favorable treatment on cases.

In violation of Title 18, United States Code, Section 1623.

## COUNT SEVENTY-TWO

## PERJURY - THOMASINE TYNES

**THE GRAND JURY FURTHER CHARGERS THAT:**

1.     Paragraphs 1 through 26 and 28 through 67 of Count One, and the "Overt Acts" of Count One, are incorporated here.

2.     On or about October 4, 2011, in the Eastern District of Pennsylvania, defendant

## THOMASINE TYNES,

while under oath and testifying in a proceeding before a grand jury of the United States in the Eastern District of Pennsylvania, knowingly made a false material declaration.

3.     The grand jury empaneled on or about February 4, 2011, was conducting an investigation to determine, in part, whether individuals at and associated with Traffic Court engaged in the manipulation of tickets outside the judicial process, commonly known as "ticket-fixing" and referred to as "consideration."  It was material to this investigation to determine which individuals, and specifically which judges, participated in this practice.

4.     With respect to this material matter, defendant THOMASINE TYNES testified as follows, at page 29 of the transcript:

Q:     You've never taken action on a request?

A:     No.

5.     The testimony of defendant TYNES, as she then and there well knew and believed, was false, in that TYNES did take action on requests for favorable treatment on cases.

In violation of Title 18, United States Code, Section 1623.

## COUNT SEVENTY-THREE

### FALSE STATEMENT TO FBI - WILLIE SINGLETARY

**THE GRAND JURY FURTHER CHARGERS THAT:**

1. Paragraphs 1 through 26 and 28 through 67 of Count One, and the "Overt Acts" of Count One, are incorporated here.

2. On or about September 21, 2011, in the Eastern District of Pennsylvania, defendant

**WILLIE SINGLETARY,**

in a matter within the jurisdiction of the Federal Bureau of Investigation (FBI), an agency of the United States Department of Justice, knowingly and willfully made a false material statement.

3. Agents of the FBI were investigating the existence of a wire and mail fraud conspiracy charged in Count One of this indictment. A material question in this inquiry was whether defendant WILLIE SINGLETARY assisted in the manipulation of or provided preferential treatment in any Traffic Court matter outside the judicial process.

4. With respect to these material matters, defendant WILLIE SINGLETARY stated that he had never arranged or facilitated preferential treatment to anyone with a matter in Traffic Court.

5. These statements were false, as defendant WILLIE SINGLETARY then knew, as explained in the incorporated paragraphs of Count One of this indictment.

In violation of Title 18, United States Code, Section 1001.

## COUNT SEVENTY-FOUR

### FALSE STATEMENT TO FBI - WILLIE SINGLETARY

**THE GRAND JURY FURTHER CHARGERS THAT:**

1.      Paragraphs 1 through 26 and 28 through 67 of Count One, and the "Overt Acts" of Count One, are incorporated here.

2.      On or about September 21, 2011, in the Eastern District of Pennsylvania, defendant

**WILLIE SINGLETARY,**

in a matter within the jurisdiction of the Federal Bureau of Investigation (FBI), an agency of the United States Department of Justice, knowingly and willfully made a false material statement.

3.      Agents of the FBI were investigating the existence of a wire and mail fraud conspiracy charged in Count One of this indictment.  A material question in this inquiry was whether defendant WILLIE SINGLETARY assisted in the manipulation of or provided preferential treatment in any Traffic Court matter outside the judicial process.

4.      With respect to these material matters, defendant SINGLETARY stated that he never waived any fines, reduced fines, reduced any points, or eliminated any tickets at the request of another judge or employee of the City of Philadelphia, nor through a previous arrangement prior to a court hearing

5.      These statements were false, as defendant WILLIE SINGLETARY then knew, as explained in the incorporated paragraphs of Count One of this indictment.

In violation of Title 18, United States Code, Section 1001.

## COUNT SEVENTY-FIVE

### FALSE STATEMENT TO FBI - WILLIAM HIRD

**THE GRAND JURY FURTHER CHARGERS THAT:**

1.      Paragraphs 1 through 26 and 28 through 67 of Count One, and the "Overt Acts" of Count One, are incorporated here.

2.      On or about September 21, 2011, in the Eastern District of Pennsylvania, defendant

### WILLIAM HIRD,

in a matter within the jurisdiction of the Federal Bureau of Investigation (FBI), an agency of the United States Department of Justice, knowingly and willfully made a false material statement.

3.      Agents of the FBI were investigating the existence of a wire and mail fraud conspiracy charged in Count One of this indictment.  A material question in this inquiry was whether WILLIAM HIRD assisted in the manipulation or preferential treatment of any Traffic Court matter outside the judicial process.

4.      With respect to this material matter, defendant WILLIAM HIRD told the agents that he never manipulated or "fixed" tickets for defendant HENRY P. ALFANO.

5.      These statements were false, as HIRD then knew, as explained in the incorporated paragraphs of Count One of this indictment.

In violation of Title 18, United States Code, Section 1001.

## COUNT SEVENTY-SIX

### FALSE STATEMENT TO FBI - WILLIAM HIRD

**THE GRAND JURY FURTHER CHARGERS THAT:**

1.      Paragraphs 1 through 26 and 28 through 67 of Count One, and the "Overt Acts" of Count One, are incorporated here.

2.      On or about September 21, 2011, in the Eastern District of Pennsylvania, defendant

**WILLIAM HIRD,**

in a matter within the jurisdiction of the Federal Bureau of Investigation (FBI), an agency of the United States Department of Justice, knowingly and willfully made a false material statement.

3.      Agents of the FBI were investigating the existence of a wire and mail fraud conspiracy charged in Count One of this indictment.  A material question in this inquiry was whether WILLIAM HIRD assisted in the manipulation or preferential treatment of any Traffic Court matter outside the judicial process.

4.      With respect to this material matter, defendant WILLIAM HIRD stated that he never arranged to manipulate any Traffic Court hearings.

5.      These statements were false, as HIRD then knew, as explained in the incorporated paragraphs of Count One of this indictment.

In violation of Title 18, United States Code, Section 1001.

# COUNT SEVENTY-SEVEN

## FALSE STATEMENT TO FBI - WILLIAM HIRD

**THE GRAND JURY FURTHER CHARGERS THAT:**

1.      Paragraphs 1 through 26 and 28 through 67 of Count One, and the "Overt Acts" of Count One, are incorporated here.

2.      On or about September 21, 2011, in the Eastern District of Pennsylvania, defendant

**WILLIAM HIRD,**

in a matter within the jurisdiction of the Federal Bureau of Investigation (FBI), an agency of the United States Department of Justice, knowingly and willfully made a false material statement.

3.      Agents of the FBI were investigating the existence of a wire and mail fraud conspiracy charged in Count One of this indictment.  A material question in this inquiry was whether WILLIAM HIRD assisted in the manipulation or preferential treatment of any Traffic Court matter outside the judicial process.

4.      With respect to this material matter, defendant WILLIAM HIRD stated that Fortunato N. Perri, Sr. did not discuss "fixing" tickets or manipulating traffic court hearings with him.

5.      These statements were false, as HIRD then knew, as explained in the incorporated paragraphs of Count One of this indictment.

In violation of Title 18, United States Code, Section 1001.

**A TRUE BILL:**

_____

**GRAND JURY FOREPERSON**

_____
**ZANE DAVID MEMEGER**
**UNITED STATES ATTORNEY**