# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA      :

          v.              :        **CRIMINAL NO. 13-039-07**

WILLIAM HIRD           :

## GOVERNMENT'S CHANGE OF PLEA MEMORANDUM

### I.    INTRODUCTION/BACKGROUND

On January 29, 2013, a federal grand jury returned an indictment charging the defendant with conspiracy to commit wire and mail fraud, in violation of Title 18, United States Code, Section 1349; eleven counts of wire fraud, in violation of Title 18, United States Code, Section 1343; three counts of mail fraud, in violation of Title 18, United States Code, Section 1341; and three counts of false statements to the FBI, in violation of Title 18, United States Code, Section 1001.   This case arises out of a conspiracy and scheme to fix traffic tickets in Philadelphia Traffic Court.   The defendant will tender a plea of guilty to the indictment on December 20, 2013.

### II.    TERMS OF PLEA AGREEMENT

The plea agreement in this case has been reduced to writing and the signed original will be filed with the Court during the Rule 11 colloquy.   The plea agreement, a copy of which is attached, can be summarized in pertinent part as follows:

1.      The defendant agrees to plead guilty to Counts One, Three, Four, Five, Six, Sixteen, Seventeen, Eighteen, Nineteen, Twenty, Twenty-Two, Twenty-Three, Fifty-Eight, Fifty-Nine, Sixty, Seventy-Five, Seventy-Six and Seventy-Seven of the indictment.

2.      The defendant agrees to pay the special victims/witness assessment in the amount of $1,800 as directed by the court.

3.      The government will make whatever sentencing recommendation as to imprisonment which the government deems appropriate; and will comment on the evidence and circumstances of the case; bring to the Court's attention all facts relevant to sentencing and to the character and any criminal conduct of the defendant; address the Court regarding the nature and seriousness of the offense; respond factually to questions raised by the Court; correct factual inaccuracies in the presentence report or sentencing record; and rebut any statement of facts made by or on behalf of the defendant at sentencing.

4.      Pursuant to § 6B1.4 of the Sentencing Guidelines, the parties enter into the following stipulations:

(a)      The parties agree and stipulate that the base offense level is 7 pursuant to U.S.S.G. § 2B1.1(a)(1).

(b)      The parties agree and stipulate that, as of the date of this agreement, the defendant has demonstrated acceptance of responsibility for his offense, making the defendant eligible for a two-level downward adjustment under U.S.S.G. § 3E1.1(a).

5.      The defendant voluntarily and expressly waives all his rights to appeal or collaterally attack his conviction, sentence or any matter relating to this prosecution unless the government appeals, his sentence exceeds the statutory maximum on any count of

conviction, the sentencing judge erroneously departs upward from the otherwise applicable sentencing guideline range, or erroneously imposes an upward variance above the final Sentencing Guideline range determined by the Court.   The defendant also reserves the right to appeal whether the indictment sufficiently alleges that the defendant engaged in a scheme to defraud the Commonwealth of Pennsylvania and the City of Philadelphia of money in costs and fees.   Notwithstanding the waiver provision set forth in this paragraph, the defendant may file a petition for collateral relief under 28 U.S.C. § 2255 but may only raise a claim that guilty plea counsel provided constitutionally ineffective assistance.

No other promises, agreements or conditions have been entered into other than those set forth in the plea agreement.

## III.   ELEMENTS OF THE OFFENSES

To establish a violation of <u>conspiracy to commit wire and mail fraud</u>, the government must prove the following elements beyond a reasonable doubt:

1.   The conspiracy, agreement, or understanding described in the indictment to commit wire and/or mail fraud was formed by two or more persons and was existing at or about the time charged in the indictment;

2.   The defendant knew of the purpose of the conspiracy and deliberately joined it; and

3.   After the conspiracy came into existence, at least one of the conspirators knowingly performed at least one of the overt acts alleged in the indictment to further or advance the purpose of the conspiracy, agreement, or understanding.

3

To establish a violation of <u>mail fraud</u>, the government must prove the following elements beyond a reasonable doubt:

      1.     The defendant knowingly devised or participated in a scheme to defraud or to obtain money or property by materially false or fraudulent pretenses, representations or promises;

      2.     The defendant acted with the specific intent to defraud; and

      3.     In advancing, furthering, or carrying out the scheme, the defendant used the mails, or caused the mails, to be used.


To establish a violation of <u>wire fraud</u>, the government must prove the following elements beyond a reasonable doubt:

      1.     The defendant(s) devised or intended to devise a scheme or artifice to defraud, or to obtain money or property by means of false or fraudulent pretenses, representations or promises, and

      2.     for the purpose of executing the scheme or artifice or attempting to do so,

      3.     The defendant(s) knowingly caused to be transmitted by means of wire communications in interstate commerce, writings, signs, and signals.[1]

---

[1] The specific intent requirement under the wire fraud statute pertains to the scheme to defraud, not to the causing of the wire transmissions.   <u>United States v. Cusino</u>, 694 F.2d 185, 188 (9th Cir. 1982).   The government is required to show that the defendants either have devised the fraudulent scheme themselves, or have willfully participated in it with knowledge of its fraudulent nature.   <u>Pearlstein</u>, 576 F.2d at 537.   Where one does an act with knowledge that a wire will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he causes a wire transmission.

To establish a violation of <u>false statement to the FBI</u>, the government must prove the following elements beyond a reasonable doubt:

1. The defendant made a statement;

2. The statement was false;

3. The statement was material;

4. The defendant had the specific intent to deceive; and

5. The matter was within the jurisdiction of an agency or department of the executive branch of the United States government.

## IV.    <u>MAXIMUM STATUTORY SENTENCE</u>

The maximum sentence that the defendant can receive for conspiracy to commit mail and/or wire fraud is 20 years' imprisonment, a 3 year period of supervised release, a $250,000 fine, and a $100 special assessment.

The maximum sentence that the defendant can receive for each count of wire fraud is 20 years' imprisonment, a 3 year period of supervised release, a $250,000 fine, and a $100 special assessment.

The maximum sentence that the defendant can receive for each count of mail fraud is 20 years' imprisonment, a 3 year period of supervised release, a $250,000 fine, and a $100 special assessment.

The maximum sentence that the defendant can receive for each count of false statements to the FBI, is 5 years' imprisonment, a 3 year period of supervised release, a $250,000 fine, and a $100 special assessment.

The total maximum sentence is thus 315 years' imprisonment, three years of supervised release, a $4.5 million fine, and a $1,800 special assessment.

## V.   <u>EVIDENCE IN SUPPORT OF THE CHARGES</u>

If the government proceeded to trial it would present the following evidence, which was pertinent to all times relevant to the indictment:

Philadelphia Traffic Court judges presided over and adjudicated moving violations, commonly referred to as traffic tickets or citations, occurring within Philadelphia, issued by the Philadelphia Police Department and the Pennsylvania State Police, and other police entities.   Traffic Court was responsible for the collection of fines and court costs resulting from guilty pleas and findings of guilt for violations of the Pennsylvania Motor Vehicle Code. Guilty adjudications subjected a violator to statutorily determined fines and costs of court, as well as possible statutorily mandated "points" on a driving record.   The moneys received from the fine portion of a guilty adjudication were equally divided between the City of Philadelphia and the Commonwealth of Pennsylvania.   The moneys received from the costs portion of a guilty adjudication were distributed to various funds of the City of Philadelphia.   For guilty adjudications of citations issued by the Pennsylvania State Police, the moneys received were distributed exclusively to the Commonwealth of Pennsylvania;

Defendant William Hird served as Judge Fortunato N. Perri, Sr.'s personal assistant at Philadelphia Traffic Court from approximately 1997 until 2001.   In 2001, Perri recommended that Hird be promoted to the position of Court Administrator and given the title of Director of Records, which resulted in a substantial pay increase.   He remained in this position until November 2011;

6

Hird and his co-conspirators used the Philadelphia Traffic Court to give preferential treatment to certain ticketholders, most commonly by fixing tickets for those with whom they were politically and socially connected;

In order to provide the requested preferential treatment, Hird and his fellow co-conspirators used their positions at Traffic Court to manipulate Traffic Court cases outside the judicial process, thereby achieving favorable outcomes on traffic citations for others.   This manipulation, or "ticket fixing" consisted of dismissing tickets outright, finding the ticketholder not guilty after a "show" hearing, adjudicating the ticket in a manner to reduce fines and avoid the assignment of points to a driver's record, and obtaining continuances of trial dates to "judge-shop," that is to find a Traffic Court judge who would accede to a request for preferential treatment;

Traffic Court judges and the administrative staff who participated in the extrajudicial ticket-fixing commonly referred to requests for preferential treatment as requests for consideration.   Traffic Court judges used their personal assistants and courtroom staff to communicate these consideration requests to other judges, as well as to receive consideration requests from other judges, court administrators, and staff.   Personals and other Traffic Court employees, including defendant Hird, familiar with the consideration process, also made preferential treatment requests on behalf of their friends or family.   In working outside the judicial process, consideration enabled judges to fix tickets for, and to provide benefits to, well-connected individuals that were not available to the rest of the citizenry;

Personals and courtroom staff regularly accessed the Traffic Court computer system to determine which judge was assigned to a particular trial in order to communicate the

7

consideration request to that judge's personal or staff.   In acceding to requests for consideration, Hird and his co-conspirators were depriving the City of Philadelphia and the Commonwealth of Pennsylvania of money which would have been properly dues as fines and costs;

Defendant Hird conveyed consideration requests through personals and court staff to the judge assigned to the case.   At times, retired Judge Perri, through defendant Hird, attempted to arrange for a specific judge to hear a case.   Typically, after a citation was adjudicated, defendant Hird provided a computer printout from the Traffic Court computer system of the case disposition to former Judge Perri;

As a high level administrator, Hird used his unique position in Traffic Court to facilitate the numerous requests for consideration presented to him by Perri, local politicians, and others.   Hird's close relationship with many of the Traffic Court judges enabled him to speak directly to a judge or through the judge's personal assistant and courtroom staff about specific consideration requests.   Hird also directed his underlings to convey these consideration requests to the judges.   Hird facilitated requests for preferential treatment from two Philadelphia ward leaders, and from retired Traffic Court Judge Kenneth Miller;

On or about September 29, 2009, co-conspirator Henry P. Alfano informed a ticketholder, B.D., that they had to "re-enlist" that case because they did not like who it was in front of, referring to the practice of defendant Hird and former Judge Perri to arrange for certain cases to be assigned to specific judges to maximize the likelihood of a favorable outcome.   The case was ultimately heard by co-conspirator Robert Mulgrew, who found ticketholder B.D. not guilty;

8

On or about May 7, 2010, former Judge Perri. and defendant Hird had a telephone conversation discussing citations which co-conspirator Alfano wanted fixed.   Perri said, "I got a matter for the 12th.   It's one of Eddie's . . . There is another one here he just mailed . . . . It is a two ticket thing."   Perri said he would give the tickets to defendant HIRD the next day.   Hird also explained that he had another one of "Eddie's" on the 10th.   HIRD explained that he did not "know who [which Traffic Court judge] is in there, but we'll see . . . but we'll figure it out . . . . I'll work it out";

On or about December 10, 2010, defendant Hird spoke with a Philadelphia ward leader, about the impound of the ward leader's son's truck.   The ward leader said he already called co-conspirator Michael Lowry about this;

In a telephone conversation on or about January 14, 2011, co-conspirators Judge Mark Bruno and Judge Perri discussed "fixing" a citation received by J.M.   Perri offered to "look into it," stating that he still "got a little connections."   During the call, Perri took credit for "putting" Bruno in Traffic Court to preside over cases;

In calls after January 14, 2011, Perri discussed Bruno's request to "fix" J.M.'s ticket with defendant Hird.   Both Hird and Perri discussed measures to remove any points assessed on the ticket;

On or about March 15, 2011, defendant Hird had a telephone conversation with another Philadelphia ward leader about "fixing" a specific ticket.   The ward leader told Hird that he wanted to slide an item under Hird's door, referring to a traffic citation.   Hird instructed the ward leader to put "H" on it so that Hird knew it was from the ward leader.   The next day, Hird and the ward leader further discussed the citation.   The ward leader said that the

9

ticketholder wanted to avoid points.    Hird said that the ticket would likely be reduced to 10 mph or 5 mph over the speed limit and that with 10 mph there would still be points assigned.    Hird said, "I'll ask for 5 over but I don't know that'll happen because it's 90 . . .    they don't normally go down to 5 . . . and its State Police . . .    they got the equipment . . . they got radar, they got tracker."    In another call that day, the ward leader asked whether the ticketholder even had to show up for the trial, and Hird agreed that the ticketholder should plead not guilty.

### Count Three--Wire Fraud

On or about February 17, 2010, A.S. visited co-conspirator Henry P. Alfano at Century Motors, Inc. to discuss a citation that A.S. received two days earlier from a Pennsylvania State Trooper for driving a tractor trailer that was dropping ice and snow onto travel lanes, striking vehicles on Interstate 95, and which carried a fine of $300 and costs of $142.    On or about March 8, 2010, A.S. again contacted Alfano about his matter in Traffic Court.    Referring to a March 3, 2010, notification from Traffic Court that his driving privileges were being suspended because he failed to respond to the traffic citation, A.S. said he will "drop [the Traffic Court information] off" to Alfano.    Alfano stated, "we'll take care of it . . . we're working on it."

On or about March 15, 2010, in an interstate telephone call between Fortunato N. Perri, Sr., in Pennsylvania, and Alfano, in New Jersey, Alfano confirmed that Perri received A.S.'s "thing" that Alfano had sent Perri in the mail.    Perri stated that "it will be alright, don't worry about it."    On or about March 26, 2010, A.S. told defendant Alfano that he received a Notice of License Suspension because he did not plead guilty or not guilty.    Alfano    told him that "he [Perri] already did that for you."    Alfano told A.S. to bring him the Notice and that

Alfano would send it to Perri again.   Alfano said that he already spoke to Perri about A.S.'s citation and that Perri said everything was okay and that Perri would send a receipt when the case was over.   Alfano assured A.S. that his license would not be suspended.

On or about March 26, 2010, Alfano told Perri that A.S. received another Notice of License Suspension and was concerned because he was a truck driver and cannot have a suspended license.   Perri told defendant Alfano that Perri was "on top of that . . . I don't want you worry about that."   Perri instructed Alfano to mail the notice to Perri.   In a subsequent call on this same date, Alfano assured A.S. that Perri had "it under control, " and told A.S. that he did not have to appear at the Traffic Court hearing because Perri is "gonna handle it. . .   it's just gonna be knocked out."

On or about March 27, 2010, Perri and defendant Hird discussed A.S.'s citation. Perri said that "the guy keeps getting letters" from Traffic Court that his license may be suspended.   Hird said he would look into it and "stop all that action," and that the ticketholder should "ignore it."   On or about April 20, 2010, co-conspirator Michael J. Sullivan adjudicated A.S.'s citation as not guilty, even though A.S. never appeared in court.

On or about May 12, 2010, Alfano told A.S. that he should have his "receipt in a couple of days."   On or about May 12, 2010, Perri, Hird and Sullivan caused a "receipt" to be mailed to A.S., which documented that his citation was adjudicated not guilty.

**Count Four--Wire Fraud**

On or about March 6, 2010, co-conspirator Alfano called Perri to discuss an Oasis bus, driven by L.R., that was impounded by the police on that date.   (A Philadelphia police officer issued two citations to L.R. for not having a CDL (commercial driver's license), which

carried a fine of $500 and costs of $101.50, and for not having a medical certificate, which carried a fine of $25 and costs of $101.50.   At the same time, the Oasis, the company that owned the bus, also received two citations from a Philadelphia police officer for not having a fire extinguisher and a warning device, where each citation carried a fine of $51 and costs of $101.50.)   Perri advised Alfano that he would "make it easy" to get the bus released.

On or about March 7, 2010, Alfano provided Perri with information related to the citations.   Specifically, defendant Alfano told Perri that the bus was registered to the Oasis Gentlemen's Club, 6800 block of Essington Avenue, and the date that it was impounded.

On or about March 8, 2010, in an interstate telephone call between Perri in Pennsylvania and Alfano in New Jersey, Perri told Alfano that there were four tickets and "you'll take care of that with me."   Perri instructed Alfano that the owner and the driver should go to the Boot and Tow window at Traffic Court, ask for D.H., and state that "they're there to pick up the bus [and] to get the bus released."   Perri further instructed Alfano that co-conspirator Michael J. Sullivan would "waive the collateral on the four tickets [and] they don't have to post that money."   Lastly, Perri said, "and then you'll give me those four matters," referring to the citations.

On or about March 9, 2010, Alfano advised A.A., a business associate with supervisory authority over the bus impounded by the police, that he did not have to pay the four tickets and attend Traffic Court.   Alfano said, "no, when you get [the notices in the mail] you give them to me."   On or about May 10, 2010, Sullivan continued the hearing for the two Oasis tickets.   On or about May 12, 2010, co-conspirator Mark Bruno adjudicated L.R.'s citations as not guilty.

On or about May 18, 2010, Perri and Alfano discussed the continuance on the Oasis tickets.   Perri explained that the district justices were sitting the previous week and all the judges were away and therefore maybe Perri "couldn't get it through, you know what I mean?" Alfano responded, "I gotcha. I got the picture "   Perri instructed Alfano to mail Perri any notices.   In a subsequent call on or about May 18, 2010, Perri confirmed with defendant Hird that the Oasis matter was continued.   Hird explained that Sullivan continued the matter because Sullivan did not realize it was for "him," referring to Perri.   Hird explained that he gave it to Sullivan's personal assistant, but that she "[------] up" and that Hird should go directly to Sullivan instead.   Perri said that he only gave Sullivan "five a year," in reference to requests for consideration.

On or about May 21, 2010, Perri told Alfano that he was mailing Alfano two receipts, and "you got a couple more coming."   On or about June 9, 2010, Sullivan again continued the hearing for the two Oasis tickets.   On or about June 29, 2010, Perri told Alfano that he would receive another continuance notice on one of the pending citations.   Perri further told Alfano that "somebody" will "need" "to show up" at the hearing.   Perri continued that "when [the ticketholder] get[s] a notice, you'll call me with the notice and mail it . . . . and don't worry . . . it'll be taken care of . . . ."   In a later call on that same date, Alfano told A.A. that one of the Oasis tickets will be continued and that A.A. would receive a notice and should tell Alfano accordingly.

On or about September 8, 2010, co-conspirator Robert Mulgrew adjudicated one Oasis citation guilty and one Oasis citation not guilty.

**Counts Five and Six—Wire Fraud**

On or about November 23, 2010, Alfano spoke with the father of D.S. about D.S.'s traffic citation.   (On or about August 26, 2010, D.S. received a citation for traveling at a speed of 85 mph in a 55 mph zone on Interstate 95, which carried a fine of $85 and costs of $162, and subjected D.S. to a possible penalty under the Pennsylvania Vehicle Code of five points to her driving record.)

In a subsequent call on that date, Alfano told Perri that "the last one [Alfano] sent [Perri,]" the ticketholder is "gonna go."   Alfano remarked that he prefers to make the ticketholders attend their hearings, as it "makes it better."   Perri said "it'll be alright though."

On or about November 24, 2010, Alfano asked Perri whether "that girl's ok" and Perri responded that she was "fine."   Alfano again informed Perri that "they're gonna be there." Alfano and Perri confirmed that the hearing was on the "30th" at 9 a.m.   Perri responded, "You are in good hands with Allstate."   Later that day, Perri informed defendant Hird, in reference to D.S.'s citation, that "[Perri's] got a girl coming down" on November 30th and Hird stated that Perri should call Hird to give him the information.

On or about November 29, 2010, Perri told Hird the citation number on D.S.'s ticket and that "she'll be in."   Hird acknowledged that this was a State Police ticket and promised to "look at it" and "we'll go from there."[2]   On or about November 30, 2010, in an interstate telephone call between Perri, in Pennsylvania, and defendant Alfano, in New Jersey, Alfano asked about the ticket.   Perri said that it was a state police ticket and that he was "on top of it" and told Alfano that "when you give me something it's important brother."   Later that day,

---

[2]   Every check of the Traffic Court computer system accessed the ACS/Xerox computer in Tarrytown, NY and therefore traveled interstate.

Perri asked defendant Hird "how [did] we do?"   Hird stated that he did not definitely know the result because the courtroom was busy, but he was "going to assume ok" because the assigned judge was co-conspirator Michael Lowry.

On or about November 30, 2010, Lowry adjudicated the citation as guilty of a lower offense, which reduced the fine and costs.   On that same date, defendant Hird informed Perri that the charge was amended to five miles over the speed limit, despite the objection of the state police trooper, who wanted the offender to receive two points on her license.   Perri then informed Alfano of the result that the ticket was amended and "there's no points" and opined that "she still got a good break."

**Counts Sixteen and Seventeen—Wire Fraud; Count 58—Mail Fraud**

Between on or about October 14, 2010 and on or about December 14, 2010, co-conspirator Kenneth Miller mailed information pertaining to K.M.'s citation to defendant Hird.   (K.M. was issued a citation for passing traffic at approximately 60 mph in a 45 mph zone, which carried a fine of $25 and costs of $126.50.)

On or about December 14, 2010, Kenneth Miller contacted defendant Hird about this citation and said "that thing for [K.M.] is tomorrow," to which defendant Hird responded "I know."   Speaking in code to one another to signal that K.M. did not need to attend the trial, Hird stated that "I don't think anybody is going to that party."   To clarify, Miller stated, "I'll tell him [K.M.] that the meeting is cancelled."

On or about December 15, 2010, H. Warren Hogeland adjudicated K.M.'s citation as not guilty, despite the fact that K.M. did not appear in court.[3]

## Counts Eighteen and Nineteen – Wire Fraud

Between on or about December 3, 2010, and on or about February 3, 2011, J.R., owner of a towing company, spoke with defendant Hird about citations issued to J.J., a truck driver for the towing company.   (The citations were for towing a vehicle without rear lighting and without a towing agreement, which carried a fine of $125 and costs of $142.50 for the first offense and a fine of $500 and costs of $142.50 for the second offense.)

On or about February 3, 2011, defendant William Hird told J.R. to give certain paperwork to his driver.   On or about February 8, 2011, J.R. complained to defendant Hird about taking care of his trucks, such as tow licenses and inspections, yet he still had problems with "you guys," meaning Traffic Court.   Hird said that it was "no big deal," but J.R. said that he did not "want to use all my favors with you."   Hird said he would see J.R.'s "guy" tomorrow at Traffic Court and that he should plead not guilty.   On or about February 9, 2011, J.R. called defendant Hird to tell him that he was in Courtroom D and Hird said, "I know where you're at   . . .You're in D."[4]   On or about February 9, 2011, co-conspirator Michael Sullivan adjudicated J.J.'s citations as not guilty.

---

[3] Every check of the Traffic Court computer system accessed the ACS/Xerox computer in Tarrytown, NY and therefore traveled interstate.   Every adjudication was entered into a database maintained by the Traffic Court computer system.   Thereafter, the ticketholder's file was electronically sent to XEROX (formerly ACS), an information technology contractor, located in Tarrytown, New York.   Within several days of every adjudication of a ticket, XEROX (formerly ACS) forwarded the disposition file electronically to PennDOT in Harrisburg.

[4] Every check of the Traffic Court computer system accessed the ACS/Xerox computer in Tarrytown, NY and therefore traveled interstate

**Count Twenty—Wire Fraud; Count Sixty—Mail Fraud**

On or about January 28, 2011, M.D. called Fortunato N. Perri, Sr. about a citation he received for making a prohibited u-turn, which carried a fine of $25 and costs of $102.50.

On or about February 9, 2011, Perri caused a portion of M.D.'s traffic citation, which stated a plea of not guilty and included M.D.'s forged signature, to be mailed to Traffic Court.   On or about March 14, 2011, defendant Hird told Perri that he "got the date on [M.D.] everything's okay. . . . that didn't go yet, so we got that."[5]   Perri also mentioned another Traffic Court matter for "the eyeglass guy" to which defendant Hird responded, "that's coming up.   I got things under control."   Perri offered to Hird, "if you need eyeglasses, let me know."

On or about April 1, 2011, co-conspirator Thomasine Tynes adjudicated M.D.'s citation as not guilty.

**Counts Twenty-Two and Twenty-Three**

Between on or about October 13, 2010, and on or about November 29, 2010, V.B., an employee at an industrial company referred to here as C.I., informed defendant Hird about four citations that the company and one of its truck drivers, M.R., received.   (These citations were for hauling an impermissible width of load, which carried a fine of $300 and costs of $101.50, for not having a permit to carry a load with a blade of such length, which carried a fine of $500 and costs of $101.50, for an unregistered vehicle, which carried a fine of $75 and costs of $101.50, and for lack of permit, which carried a fine of $500 and costs of $101.50.)

---

5  Every check of the Traffic Court computer system accessed the ACS/Xerox computer in Tarrytown, NY and therefore traveled interstate

On or about November 29, 2010, V.B. reminded Hird that "we'll be in there Wednesday morning at 9 o'clock" for the four tickets for the C.I. trucks that were impounded and were released "about a month ago."   V.B. reminded Hird that Hird had instructed him to call him a "couple days ahead" of the hearing.   Hird said that he did not know yet to which courtroom the case was assigned and Hird told V.B. that it should be on the Notice.   Hird said that he needed to know "where it's at," otherwise "you're going to be flying on a wing and a prayer, you know what I mean?"   V.B. told Hird the citation number in order for Hird to "track it down."[6]

On or about November 30, 2010, in an interstate telephone call between V.B., in New Jersey, and Hird, in Pennsylvania, V.B. asked Hird "how we make out for tomorrow?" Hird, speaking in code, said, "I'm gonna see ya for coffee, ain't I?"   V.B. said, "I just want to make sure," and Hird responded, "I'm gonna be available for coffee."   V.B. asked, "We're in good shape, then?"   Hird responded, "Yeah, I'll talk to you tomorrow for coffee."   V.B. suggested that they meet at 8:30 a.m. to which Hird responded, "closer to 9."

On or about December 1, 2010, V.B. told Hird that he parked in the back of Traffic Court and asked whether he should come upstairs.   Hird said that he would meet V.B. in the main hallway.   On or about December 1, 2010, co-conspirator Michael Lowry dismissed each of the citations.

---

6  Every check of the Traffic Court computer system accessed the ACS/Xerox computer in Tarrytown, NY and therefore traveled interstate

On or about December 2, 2010, Fortunato N. Perri, Sr. told Hird that he knew that V.B. went in the "back gate yesterday."   Perri said, "I wouldn't even park in the "back. . . . You don't want people to see what you're doing. . . .   You do things quietly, diplomatically, like we do."

### Count Fifty-Nine—Mail Fraud

Between on or about December 11, 2010, and on or about February 2, 2011, co-conspirator Kenneth Miller mailed information pertaining to J.B.'s citation to defendant Hird. (J.B. received a traffic citation for making an improper left turn, which caused an accident, and which carried a fine of $25 and costs of $126.50.)

On or about February 2, 2011, Miller left a voice mail message for defendant Hird regarding J.B.'s citation.   In this message, Miller said that J.B. received a notice and asked defendant Hird to check on his citation.   Miller referenced "the meeting," again speaking in code for the upcoming trial date on February 14, 2011, that Miller and HIRD had discussed previously.   On or about February 14, 2011, co-conspirator Willie Singletary adjudicated J.B.'s citation as not guilty.

### Counts Seventy-Five through Seventy-Seven—False Statements to the FBI

On September 21, 2011, defendant William Hird was interviewed by the FBI during their investigation of the wire and mail fraud conspiracy alleged in the indictment.   A material question in that investigation was whether Hird assisted in the manipulation or preferential treatment of any Traffic Court matter outside the judicial process.   With respect to this material matter Hird falsely told the FBI that he never manipulated or fixed tickets for Henry P. Alfano (Count 75), never arranged to manipulate any Traffic Court hearings (Count 76), and

19

that Fortunato N. Perri, Sr. did not discuss fixing tickets or manipulating traffic court hearings with

him.   As evidenced from the facts listed above, Hird knew that these statements were false.


Respectfully submitted,

ZANE DAVID MEMEGER
United States Attorney


s/Anthony J. Wzorek
ANTHONY J. WZOREK
DENISE S. WOLF
Assistant United States Attorney

<u>CERTIFICATION</u>

I certify that the government's change of plea memorandum has been sent by

electronic mail to:

Gregory Pagano, Esq.
123 South Broad Street
Suite 810
Philadelphia, PA 19109


s/Anthony J. Wzorek
ANTHONY J. WZOREK
DENISE S. WOLF
Assistant United States Attorney
United States Attorney's Office
615 Chestnut Street; Suite 1250
Philadelphia, PA 19106-4476
(215) 861-8469
State Bar ID # 32639


DATE:      December 18, 2013