# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** : | |
| v. : | **CRIMINAL NO. 13-00039** |
| **WILLIAM HIRD** : | |

### GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)

Defendant William Hird seeks compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). This motion should be denied, given the carefully fashioned, well-litigated sentence imposed on Hird for his criminal conduct, and the fact that his medical conditions are well controlled with treatment in BOP custody.

**I.      Background.**

    **A.      Criminal Conduct.**

Ticket-fixing scheme

Defendant William Hird played a central role in the ticket-fixing scheme that was rampant at the former Philadelphia Traffic Court. Politicians, friends, and his former boss regularly approached him for preferential treatment on tickets, and Hird obliged. He facilitated preferential treatment for those who were politically and socially connected. In doing so, Hird and his co-defendants destroyed an entire court system and brought disgrace to the legal profession.

Hird used his high level position as Court Administrator in Traffic Court to facilitate the numerous requests for consideration presented to him by former judges,[1] local politicians, and others. Hird's close relationship with many of the Traffic Court judges enabled him to speak directly to a judge or through the judge's personal assistant and courtroom staff about specific consideration requests. In his position, he supervised other Traffic Court employees. On a weekly basis, Hird directed these employees to convey preferential treatment requests to the judges on his behalf. Hird also directed these employees to report to him the final case disposition.

When confronted by the Federal Bureau of Investigation, he lied and denied ever being involved in the manipulation of tickets at the Traffic Court.

<u>Sentencing</u>

The Presentence Investigation Report outlined Hird's physical condition. Hird had been treated for skin cancer in 2009, used a hearing aid and was being treated for cataractuous changes. Hird was also taking medications for diabetes and hypertension. The defense did not raise any of these issues in Hird's sentencing memorandum or during the sentencing hearing.

---

[1] Hird was a key participant in the scheme, particularly in forwarding to other judges many requests for preferential treatment made by his former boss, retired Traffic Court Judge Fortunato Perri, who pled guilty to this scheme. In one recorded call, Hird told Perri: "I am so thankful for what you did for me, for me it's unbelievable. . . . I got a pension because of you . . . ." Hird recognized that he would "still be laying f--king carpet" and "moving furniture the f--k around" if it were not for Perri, to which Perri responded: "Don't forget, whenever I call ya, it's really important." Hird acknowledged, "Yeah, well, I know that."

The sentencing judge denied Hird's request for a downward variance. The judge noted that his offense "ultimately had the effect to destroy, obliterate the traffic court . . . . It went on for a long time, at least 11 years . . . . It was pervasive." (12/15/14 Sentencing Transcript at 40). The sentencing judge recognized Hird's key role: "Politicians, friends, ward leaders approached him for preferential treatment on tickets and . . . he said no to none of them. (12/15/14 Sentencing Transcript at 41). Hird "had access to all of the players in the scheme and he could be thought of as the common denominator . . . ." (12/15/14 Sentencing Transcript at 42). Of particular note, the sentencing court emphasized the need for deterrence that a custodial sentence would satisfy.

> [T]he judges of the municipal court, who I believe [now] have [] jurisdiction of the [traffic court] [], to give them an answer to anyone who comes to them asking for consideration, so the successors of the traffic court can say . . . [t]he federal court sentenced them to prison, they were disgraced, they lost their positions.

(12/15/14 Sentencing Transcript at 42).

Most of Hird's co-defendants, former judges Thomasine Tynes, Willie Singletary, Michael Lowry and Robert Mulgrew, all received and served sentences ranging from 18 months to 24 months' imprisonment. Hird, due to his central role in the ticket-fixing scheme, deservedly received one of the highest sentences among the co-defendants, that being 24 months.

After a lengthy appellate process, the defendant just began serving his sentence at FCI Schuylkill on January 31, 2020, with an anticipated release date of October 13, 2021.

Defendant has completed about only 20% of his sentence. He has not committed any disciplinary infraction during his time in custody.

### B.     Request for Compassionate Release.

On May 5, 2020, the defendant, through retained counsel, submitted a motion to this Court for compassionate release. Hird seeks release on the basis that his age, *i.e.*, 75-years old, and medical conditions make him high risk of illness or death if he were to contract COVID-19.  He submitted a letter from his personal physician that he suffers from diabetes mellitus, Tourette's Syndrome, photo- contact dermatitis with severe itching and scaling, hearing loss, anxiety, gout, hyperuricemia and glaucoma.

Earlier, on April 17, 2020, defense counsel submitted a request for compassionate release to the warden. The request was based on the following medical conditions: diabetes, hypertension, high cholesterol, his age, as well as the risk presented should the defendant contract COVID-19. The warden denied the request for a reduction in sentence on the basis that Hird is "able to independently adapt to activities of dialing living and is able to perform self-maintenance activities in a correctional environment."  (Letter from Warden dated 4/28/20, attached hereto as Exh. A).

The undersigned obtained the medical records of the defendant since his incarceration from BOP, and provided a copy to defense counsel. The records reveal that the defendant presents with glaucoma, hearing loss, Type 2 diabetes, hypertension, anxiety disorder and hyperlipidemia. (BOP medical records, attached hereto as Exh. B).

All of these conditions appear well-controlled at this time with medication provided by the institution. The defendant otherwise is fully ambulatory and engages in all normal activities of daily living. He does not assert differently in his motion.

### C. BOP's Response to the COVID-19 Pandemic.

As this Court is well aware, COVID-19 is an extremely dangerous illness that has caused many deaths in the United States in a short period of time and that has resulted in massive disruption to our society and economy. In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge.

BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at

https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

Indeed, BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at

https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed, establishing a six-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id*. at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for potential coronavirus transmissions in January. At that time, the agency established a working group to develop

policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization.

On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

Beginning April 1, 2020, BOP implemented Phase Five of the Action Plan, which currently governs operations. The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff training.

BOP is endeavoring to regularly issue face masks to all staff and inmates, and strongly encouraged them to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting

CDC criteria for release from isolation. In addition, in areas with sustained community transmission, all facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, and remain suspended at this time, to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26,

2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission. *See* Attach. 2 (Mem. for Director of Bureau of Prisons). As of this filing, BOP has transferred 2,783 inmates to home confinement, which is an increase of 97.5% of the number who would have been eligible in the ordinary course during the same period.[2]

---

[2] This Court does not have authority to grant a transfer to home confinement, or review BOP's administrative decision regarding that issue. *See* 18 U.S.C. § 3621(b) (BOP's designation decision is not subject to judicial review). *See also, e.g., United States v. Cruz*, 2020 WL 1904476, at *4 (M.D. Pa. Apr. 17, 2020); *United States v. Mabe*, 2020 U.S. Dist. LEXIS 66269, at *1 (E.D. Tenn. Apr. 15, 2020) ("the CARES Act places decision making authority solely within the discretion of the Attorney General and the

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Unfortunately and inevitably, many inmates at various institutions have become ill, and more likely will in the weeks ahead. But BOP must consider its concern for the health of its inmates and staff alongside other critical considerations. For example, notwithstanding the current pandemic crisis, BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider myriad other factors, including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

---

Director of the Bureau of Prisons. . . . This Court therefore does not have power to grant relief under Section 12003 of the CARES Act."); *United States v. White*, 2020 WL 1906845, at *2 (E.D. Va. Apr. 17, 2020); *United States v. Skaff*, 2020 WL 1666469 (S.D.W. Va. Apr. 3, 2020).

## II. Discussion.

The compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act on December 21, 2018, provides in pertinent part:

> (c) Modification of an Imposed Term of Imprisonment.—The court may not modify a term of imprisonment once it has been imposed except that—
>
> (1)  in any case—
>
> (A)  the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i)  extraordinary and compelling reasons warrant such a reduction . . .
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Further, 28 U.S.C. § 994(t) provides: "The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." Accordingly, the relevant policy statement of the Commission is binding on the Court. *See Dillon v. United States,* 560 U.S. 817, 827 (2010) (where 18 U.S.C. § 3582(c)(2) permits a sentencing reduction based on a retroactive guideline amendment, "if such a reduction is consistent with applicable policy statements issued by

the Sentencing Commission," the Commission's pertinent policy statements are binding on the court).[3]

The Sentencing Guidelines policy statement appears at § 1B1.13, and provides that the Court may grant release if "extraordinary and compelling circumstances" exist, "after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable," and the Court determines that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."

Critically, in application note 1 to the policy statement, the Commission identifies the "extraordinary and compelling reasons" that may justify compassionate release. The note provides as follows:

> 1. Extraordinary and Compelling Reasons.—Provided the defendant meets the requirements of subdivision (2) [regarding absence of danger to the community], extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> (A)  Medical Condition of the Defendant.—
>
>   (i)  The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis

---

[3] Prior to the passage of the First Step Act, while the Commission policy statement was binding on the Court's consideration of a motion under § 3582(c)(1)(A), such a motion could only be presented by BOP. The First Step Act added authority for an inmate himself to file a motion seeking relief, after exhausting administrative remedies, or after the passage of 30 days after presenting a request to the warden, whichever is earlier.

Under the law, the inmate does not have a right to a hearing. Rule 43(b)(4) of the Federal Rules of Criminal Procedure states that a defendant need not be present where "[t]he proceeding involves the correction or reduction of sentence under Rule 35 or 18 U.S.C. § 3582(c)." *See Dillon,* 560 U.S. at 827-28 (observing that, under Rule 43(b)(4), a defendant need not be present at a proceeding under Section 3582(c)(2) regarding the imposition of a sentencing modification).

>     of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
> (ii) The defendant is—
>
>    (I) suffering from a serious physical or medical condition,
>
>    (II) suffering from a serious functional or cognitive impairment, or
>
>    (III) experiencing deteriorating physical or mental health because of the aging process,
>
>    that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
>
> (B) Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.
>
> (C) Family Circumstances.—
>
>    (i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.
>
>    (ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.
>
> (D) Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

In general, the defendant has the burden to show circumstances meeting the test for compassionate release. *United States v. Heromin,* 2019 WL 2411311, at *2 (M.D. Fla. June 7, 2019); *United States v. Stowe*, 2019 WL 4673725, at *2 (S.D. Tex. Sept. 25,

2019). As the terminology in the statute makes clear, compassionate release is "rare" and "extraordinary." *United States v. Willis*, 2019 WL 2403192, at *3 (D.N.M. June 7, 2019)

At the present time, it is apparent that, but for the COVID-19 pandemic, the defendant would present no basis for compassionate release. His medical ailments are well-controlled and do not present any impediment to his ability to provide self-care in the institution. See *Cannon v. United States*, 2019 WL 5580233, at *3 (S.D. Ala. Oct. 29, 2019) (the 71-year-old defendant suffers from significant back and stomach issues, as well as high blood pressure, diabetes, skin irritation, loss of hearing, and various other complications, but relief is denied: "First, there is no indication that Cannon is terminally ill. Second, despite the many medical afflictions Cannon identifies, he does not state, much less provide evidence, that his conditions/impairments prevent him from providing self-care within his correctional facility. Rather, the medical records provided by Cannon show that his many conditions are being controlled with medication and there is no mention that his conditions are escalating or preventing him from being from being able to provide self-care."); *United States v. Burgos-Martinez*, 2019 U.S. Dist. LEXIS 172925 (S.D. Fla. Oct. 4, 2019) (defendant is 78 years old and states that his health has begun to fail, but identifies no serious physical or mental condition, is currently housed in a low-security prison facility, not a medical center, and does not state that he is unable to take care of himself).

In addition, Hird's medical conditions were known at the time of his sentencing. *United States v. Lake*, 2019 U.S. Dist. LEXIS 148003, *7 (E.D. Ky. Aug. 30, 2019) (the defendant is suffering from chronic conditions but they do not substantially diminish his

ability to provide self-care in the correctional facility; in addition, his conditions were known at the time of sentencing: "The purpose of compassionate release is to reduce a term of imprisonment for extraordinary or compelling circumstances that could not have reasonably been foreseen at the time of sentencing").

The only question, then, is whether the risk of COVID-19 changes that assessment. The government acknowledges that the risk of COVID-19 presents "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility," as stated in note 1(A), as, due to his comorbidities, the defendant may be less able to protect himself against an unfavorable outcome from the disease.[4]

However, the defendant is not entitled to relief. This Court must consider all pertinent circumstances, including the 3553(a) factors. At present, his medical conditions are appropriately managed at the facility, which is also engaged in strenuous efforts to protect inmates against the spread of COVID-19, and would also act to treat any inmate who does contract COVID-19.[5] In the meantime, the disease is sadly rampant in

---

[4] Accordingly, this Court need not consider the suggestion that the defendant's condition falls under the "catch-all" provision of note 1(D), as the government acknowledges that he meets the threshold test of a medical condition defined in note 1(A). This legal issue, regarding whether at present a Court has authority on its own to identify "extraordinary and compelling circumstances" apart from those described in the guideline policy statement, has recently divided courts in other compassionate release contexts. Given the government's position that the defendant's condition passes the eligibility threshold as defined by the guideline, the issue need not be reached.

[5] Of note, FCI Schuylkill, as of this filing, has no positive COVID-19 cases among its staff or inmate population.

Philadelphia, where the defendant says he would return to live. As of this writing, there are 19,950 residents of the City diagnosed with the disease, and 1,040 people have died.[6]

The defendant fails to demonstrate how release, less than 5 months into a 24 month sentence for a serious crime, reflects the seriousness of the offense, promotes respect for the law and deterrence, and provides just punishment for the offense. *See* 18 U.S.C. § 3553(a)(2)(A). A consideration of the factors above shows that release at this point is inappropriate based on the offense of conviction, the defendant's managed medical condition, and the amount of time remaining on the defendant's sentence.

Courts have generally denied release in circumstances comparable to those presented here. *See, e.g.*, *United States v. Gamble*, 2020 WL 1955338 (D. Conn. Apr. 23, 2020) (diabetes is under control, COVID-19 risk is higher in the community, and the defendant has an egregious criminal history involving drug and firearm offenses); *United States v. Shah*, 2020 WL 1934930 (E.D. Mich. Apr. 22, 2020) (defendant suffers from diabetes and hypertension, but there are no cases at his facility, and BOP is making efforts to protect inmates); *United States v. Fry*, 2020 WL 1923218 (D. Minn. Apr. 21, 2020) (denied for 66-year-old man who is obese and has heart disease and high blood pressure; "To merit such compassionate release, Fry must show more than a mere speculation of the possibility of contracting the virus."); *United States v. Godofsky*, 2020 WL 2188047, at *2 (E.D. Ky. May 6, 2020) (63 years old, has high blood pressure, high cholesterol, asthma, and is currently taking medications that weaken his immune system;

---

[6] https://www.phila.gov/programs/coronavirus-disease-2019-covid-19/ Retrieved, May 18, 2020.

"even in the context of the ongoing public health crisis," this does not present an extraordinary or compelling circumstance); *United States v. Hammond*, 2020 WL 2126783, at *5 (W.D. Pa. May 5, 2020) (denied for 56-year-old with hypertension, with 4 months left to serve on 36-month sentence; no cases at Allegheny County Jail, and "[u]nfortunately, that potential [for infection] exists anywhere in the community."); *United States v. Feiling*, 2020 WL 1821457 (E.D. Va. Apr. 10, 2020) (71-year-old suffers from a variety of ailments putting him at risk of an adverse outcome from COVID-19, but he does not show a greater risk of contracting the disease in prison, in relation to his risk in the community).

Courts have generally granted compassionate release based on the threat of COVID-19 where the inmate suffers from significant ailments, is serving a short sentence or has served most of a lengthier one, does not present a danger to the community, and/or is held at a facility where a notable outbreak has occurred. *See, e.g.*, *United States v. Gileno*, 2020 WL 1916773, at *5 (D. Conn. Apr. 20, 2020) (62-year-old has asthma and other ailments, serving one-year sentence); *United States v. Diep Thi Vo*, 2020 WL 2300101 (N.D. Cal. May 7, 2020) (fraud defendant is 74 years old; has a history of hyperlipidemia and hypertension; and is scheduled to be released after 49-month sentence in less than two months); *United States v. Colvin*, 2020 WL 1613943 (D. Conn. Apr. 2, 2020) (granted with 11 days remaining on sentence, based on high blood pressure and diabetes) *United States v. Gileno*, 2020 WL 1916773, at *5 (D. Conn. Apr. 20, 2020) (62-year-old has asthma and other ailments, serving one-year sentence); *United States v. Zukerman*, 2020 WL 1659880 (S.D.N.Y. Apr. 3, 2020) (75-year-old tax evasion offender

suffers from diabetes, hypertension, and obesity, and is more at risk at Otisville; served over half of 70-month sentence); see also *United States v. Rodriguez*, 2020 WL 1627331, at *7 (E.D. Pa. Apr. 1, 2020) (Brody, J.) (release granted where defendant is vulnerable due to Type 2 diabetes mellitus with diabetic neuropathy, essential hypertension, obesity, and "abnormal liver enzymes in a pattern most consistent with non-alcoholic fatty liver disease," has only one year left on 20-year sentence, and has exhibited good behavior); *United States v. Pabon*, 2020 WL 2112265 (E.D. Pa. May 4, 2020) (Brody, J.) (drug defendant released after serving 14 months of 46-month sentence; he is 54 and suffers from diabetes, hypertension, and other ailments).

Hird committed an offense that undermined the public's trust. His sentence was carefully fashioned in light of his extraordinary offense and to send a strong message of deterrence to others from engaging in ticket-fixing. A reduction of a 24-month sentence to essentially less than 5 months would seriously undermine that sentence. *United States v. Ebbers*, No. 02-1144-3, 2020 WL 91399, at *7 (S.D.N.Y. Jan. 8, 2020) (holding that in considering the § 3553(a) factors, a court "should assess whether those factors outweigh the 'extraordinary and compelling reasons' warranting compassionate release, particularly whether compassionate release would undermine the goals of the original sentence"). A 5-month sentence is significantly lower than the time served by Hird's co-defendants. It would be an unjust windfall.

In sum, upon consideration of all pertinent factors, the motion for compassionate release should be denied.

                Respectfully yours,

                WILLIAM M. McSWAIN
                United States Attorney

                */s Denise S. Wolf*
                DENISE S. WOLF
                ANTHONY J. WZOREK
                Assistant United States Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that this pleading has been served on the Filing User identified below through the Electronic Case Filing (ECF) system:

>William J. Brennan, Esq.
>1600 Locust Street
>Philadelphia, PA  19103

>*/s Denise S. Wolf*
>DENISE S. WOLF
>Assistant United States Attorney

Dated:  May 19, 2020.